[No. E007488. Fourth Dist., Div. Two. Mar. 4, 1991.]

In re WALTER P., a Minor.
RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL
SERVICES, Plaintiff and Respondent, v.
DUANE P. et al., Objectors and Appellants.

COUNSEL

Kurt Arthur Seidler and Peter C. Carton, under appointments by the Court of Appeal, for Objectors and Appellants.

Gerald J. Geerling, County Counsel, and Michael D. Ellis, Deputy County Counsel, for Plaintiff and Respondent.

Deborah Mohr Walker, under appointment by the Court of Appeal, for Minor.

OPINION

DABNEY, J.—Objectors and appellants Susan and Duane P., parents of minor Walter P., appeal from a judgment freeing minor from their custody and control pursuant to Civil Code section 232.[1] They contend that (1) the res judicata effect of earlier lawsuits barred the freedom from custody and control action; (2) the judgment violates the doctrine of law of the case; (3) delay of the trial of this matter violated the requirement of section 232.3 that a section 232 action be set for trial not more than 45 days after completion of service on the parties; (4) the evidence was insubstantial to support a finding of abandonment; and (5) the court erred by failing to

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

assess whether services offered by the state through regional centers would have enabled the mother, a developmentally disabled parent, to keep her family intact.

FACTUAL AND PROCEDURAL HISTORY[2]

Minor was born on May 18, 1982. When he was three months old he and three siblings were removed from their home and adjudged dependents of the juvenile court, because an unrelated person residing in their home physically abused them and their mother failed to protect them from this person. In addition, minor was diagnosed at that time as nutritionally deprived and failing to thrive. The juvenile court eventually terminated the dependencies of minor's siblings, two of whom returned home and one of whom became a parent and went to live on her own. Minor, however, never returned home and remained in foster care, either as a dependent of the court or under the guardianship of his foster parents, until the department of public social services (DPSS) filed the within section 232 petition on his behalf approximately six years after the juvenile court first found him to be a dependent.

The juvenile court approved, and minor's parents were furnished with copies of plans for their reunification with minor at the time minor was first made a court dependent, on December 1, 1982. The plans required that the parents participate in family therapy, counseling or education classes on parenting; sign consent for release of information forms; cooperate in making and following through on a visitation plan (once a week for the mother; once a month for the father); that the father maintain a residence and a stable job in one place for at least six months, and demonstrate legal means for supporting the family, including providing them with adequate income, food and clothing; and that the mother show that she could properly supervise her children at all times and provide a safe and clean home for them.

At the time minor was placed in foster care, his health was very fragile. The social worker's report in support of the original petition stated that the doctor who diagnosed minor as nutritionally deprived and failing to thrive had indicated that the minor needed "consistent and intensive physical and medical care and appropriate stimulation to overcome his early developmental deficiencies." An additional memo to the court during that

---

[2] This court, at appellant father's request, took judicial notice of this court's opinion in a previous appeal, No. E003052, filed May 25, 1988, in which the parents appealed from a permanency planning order in this case, on April 23, 1990. The trial court in this section 232 action read and considered the entire juvenile court file in this case in determining whether or not it should free minor from the custody and control of his parents, and also took judicial notice of the findings and orders made in the juvenile court case. Pursuant to Evidence Code sections 452 and 459, this court takes judicial notice of the juvenile court file in this matter. Some of the facts set out below are taken from the juvenile court file.

time period stated that minor's health was fragile due to the failure of his skull to close and because of signs that he might have hypotonia (a muscular disorder) and a hydrocephalic condition.

The reunification plan did not specify that the mother was to take any special precautions related to minor's fragile health. However, on January 24, 1983, minor's mother signed a service agreement in which she agreed to cooperate with his doctors and foster parents (both registered nurses) in regularly scheduled visitation and in "learning how to handle Walter's special problems and treatment as prescribed by medical authorities." She also agreed to participate in counseling for six months with Riverside County Mental Health at its Lake Elsinore substation.

During the six months after minor's mother signed the service agreement it was determined that the sphincter at the top of minor's stomach was not properly developed, so that food backed up into his esophagus, and that he had chronic problems with asthma. During that period he also had two bouts with viral pneumonia and had to be hospitalized. All of the liquids which minor drank had to be thickened and any exposure to cigarette smoke caused him to wheeze.

Minor's mother had difficulty at first understanding the need to thicken his liquids and keep him away from cigarette smoke, but began to follow instructions on these matters after repeated explanations. She also attended counseling sessions regularly; at the time the social worker prepared her report for the first semiannual review, the counselor stated that the mother had only two more sessions to attend and that she had made progress and gained insight in her counseling. Both parents had regular visitation with minor in their own home.

The social worker recommended that minor remain in care for another three or four months until his health became more stable, at which time she opined the parents would be ready to resume his care. The juvenile court continued minor as a dependent of the court and retained him in the care of his foster parents.

During the ensuing six months, minor's mother's housekeeping skills deteriorated to such an extent that the public health nurse and child protective services worker began providing her with specific services and supervision. When the reporting social worker visited the home, she found dirty dishes, old food, clean and dirty clothes strewn about; the odor of cat feces in the home and dog feces in the yard; and garbage piled up in the porch and yard. Housekeeping would improve with specific instruction, but then deteriorate once more.

Minor's health remained fragile, and his parents "failed to consistently provide [him] with a healthy environment during visits." Minor could not be exposed to cigarette smoke, or to chills or drafts, and required plenty of rest. Minor repeatedly returned to the foster home after visits with his parents smelling of cigarette smoke and often required medications due to an asthmatic reaction. He also returned physically exhausted and was too tired to eat.

The social worker noted in her report for the second semiannual review and permanency planning hearing that the parents had continued to visit regularly, at least once a month. She made no reference as to whether the mother was still involved in counseling or any other provisions of the reunification plan. Apparently basing her opinion on the problems with the parents' home environment, she recommended that minor continue in placement "due to the parents [*sic*] failure to comply with the Reunification Plan." She stated that reunification might occur within the next six months and submitted a service plan requiring that the parents attend a parenting class or cooperate with a parenting aid. The juvenile court continued the minor in foster care for an additional six months.

At the time of the third semiannual review and permanency planning hearing things had not improved for minor's parents. They had been evicted from their home and had moved in with an elderly, disabled aunt whose house was so small that minor would have no place to sleep if he returned home. They had a new baby whose needs they were having some trouble meeting. The mother's housekeeping skills had not improved, despite the fact that a volunteer was working with her on a regular basis.

Because of problems with the parents' home environment, their visits with minor had decreased in frequency. Minor remained in fragile health, highly susceptible to pneumonia and asthma, but his parents continued to expose him to drafts, chills and cigarette smoke and to allow him to become seriously overtired. Minor would return from visits with his parents "very tired, dirty and smelly." He would be wheezing and after one visit developed a cold which nearly went into pneumonia. Eventually during this period the parents began to shield minor from cigarette smoke again, so that he smelled of smoke only occasionally after a visit.

Because of concern that minor's parents would not be able in the future to provide him with a safe environment or respond to his medical needs, his social worker recommended to the juvenile court that it refer minor to DPSS so that it might initiate a freedom from custody and control action on his behalf pursuant to section 232 and place him in a preadoptive home. The juvenile court ordered DPSS to begin section 232 proceedings on June

26, 1984, approximately one year and eight months after he was first taken from his parents' home.

Two more semiannual reviews (the fourth and fifth) took place while the 232 action was pending. The circumstances remained much the same, though the parents did move to a larger house and their visits became sporadic and less frequent.

On October 7, 1985, the superior court denied the section 232 petition which DPSS had filed on minor's behalf. While the section 232 action was pending, minor's parents had regular visitation privileges with their son, though they did not receive other reunification services. At the sixth semiannual review and permanency planning hearing, held shortly after the petition was denied, minor's social worker recommended a permanency plan of legal guardianship for minor because reunification of minor and his parents did not appear likely. Minor's foster parents indicated their desire to be his legal guardians, and indicated for the first time that they would like to adopt minor eventually.

In her report for the sixth semiannual review, minor's social worker stated that minor's physical health was basically sound, though he continued to be susceptible to asthma and sensitive to cigarette smoke. Minor's parents continued to visit with him, though not on a regular basis. Occasionally, problems with transportation prevented the parents from visiting. The visits resulted in many of the same problems as before, though the parents had learned not to expose minor to cigarette smoke. Minor returned home exhausted, and indicated to his foster parents that his parents had not allowed him to take a nap. He also returned occasionally with diarrhea or asthma. At the time of the permanency planning hearing, the parents had living with them a man who had recently been released from state prison after serving a sentence for rape. The man's parole officer advised minor's social worker that he felt the man represented a danger to minors living in the home.

The juvenile court accepted the social worker's recommendation for permanency planning and directed DPSS to initiate guardianship proceedings on minor's behalf. It also ordered visitation between minor and his parents "as directed by DPSS and with concern for the health of the minor." During the pendency of the guardianship proceedings, no other reunification services were provided to the parents. In August of 1986 the juvenile court appointed minor's foster parents his legal guardians. Subsequently, the court terminated minor's dependency.

Minor's parents appealed from the permanency planning order directing DPSS to initiate legal guardianship proceedings for minor.[3] This court ruled that the order directing DPSS to file a guardianship petition for the minor was not appealable; however, we held that the order for visitation must be voided because it gave unfettered discretion to DPSS to decide the terms of visitation between parents and minor. We ordered the juvenile court to enter an order "specifying the amount, duration and type of visitation between minor and his natural parents." In this appeal, we also entertained a collateral attack on the validity of the order appointing legal guardians for minor, and concluded that the order was void because the petition for guardianship had been brought in probate court, which had no jurisdiction to hear such a petition.

Following vacation of the guardianship DPSS petitioned the juvenile court to vacate its termination of minor's dependency. The juvenile court reestablished the dependency in June of 1988, relating back to when dependency was originally terminated, and immediately scheduled a review and permanency planning hearing. The court asked minor's social worker to set up and observe a visit between minor and his parents so that she could inform the court concerning the "degree of bonding and relationship" between minor and his parents.

In her report for the hearing, minor's social worker stated that minor's health was greatly improved since the last review hearing, though he still suffered from asthma and was somewhat fragile. She reported that while minor's foster parents had been his legal guardians they had arranged visits with minor's parents whenever the parents called to set up a visit. During the year and approximately eight months of the guardianship, the parents visited minor six times and missed two other scheduled visits. Minor told the social worker that his parents were his "friends" and he appeared to enjoy his visits with them. Minor's mother told the social worker that she would like to have additional visits with minor and that she would like to work toward reunification with him.

In an additional memorandum to the juvenile court, minor's social worker reported her observations during a visit between minor and his parents. She found that during the visit the parents talked to minor very little. Neither parent asked minor questions about his home, what he was doing in school, or any other things about his daily life. Minor spent most of the visit wrestling with his father, while his mother took pictures of him and talked

---

[3] This court previously took judicial notice of its opinion in the appeal from the appointment of guardians for minor, case No. E003052, and deemed the opinion a part of the record on appeal. (See this court's order, Apr. 23, 1990.)

with the social worker. Based on her observations and conversations with minor, the social worker opined that minor had some bond with his parents, but not the close bonding he enjoyed with his foster parents, and that it would be "extremely detrimental" to him to remove him from the foster parents' home.

The social worker recommended to the court that the foster parents once again be appointed legal guardians and that visitation continue to be as requested by the parents. The juvenile court rejected the social worker's recommendation; it ordered a permanency plan of adoption for minor and directed DPSS to again initiate freedom from custody and control proceedings on minor's behalf pursuant to section 232. The court made a detailed visitation order, directing that the parents be allowed to visit minor once a month, with visitation to take place on weekends, for a minimum of one and a maximum of four hours, at a neutral setting away from the foster parents' home. It also ordered DPSS to assist in coordinating the visitation schedule.

DPSS filed a section 232 petition on minor's behalf on October 7, 1988, approximately six years and one month after he had been removed from his home, alleging that minor's parents had abandoned him (§ 232, subd. (a)(1)), abused and neglected him (§ 232, subd. (a)(2)), and that he had been in out-of-home placement [for over one year] and his return to his home would be detrimental in that his parents had failed and were likely to fail in the future to care for and control minor and maintain an adequate parental relationship with him (§ 232, subd. (a)(7)). On the same date the superior court issued citations to minor's parents directing them to appear for a show cause hearing on the petition on December 7, 1988. Sheriff's deputies were unable to serve the citations, however, because they could not locate the parents, who had moved from their last known address. The record reflects that the deputies made their first attempt at serving the citations on October 22, 1988. The probation officer who was preparing a report for the section 232 action was also unable to locate the parents, though he found two addresses where they had resided for a time. The hearing was then continued to February 16, 1989, for return of the citation. On December 13, minor's mother informed his social worker that she had separated from her husband and furnished new addresses for both herself and her husband. On December 20, 1988, the parents were personally served when they appeared at juvenile court for a review hearing.

The parents appeared without counsel on February 16, 1989, for the return of the citation. The superior court continued the matter until May 1, 1989, so that counsel could be appointed to represent the parents. On March 22, 1989, counsel was appointed for the parents and the court granted the foster parents status as de facto parents. On May 31, 1989, the day

set for trial, a request for continuance was granted until August 14, 1989, so that minor could be given a psychological evaluation. An additional request for continuance was granted so that the evaluation could be completed. In September the case was assigned to a judge; later that judge became unavailable and the case was assigned to another judge. Trial of the action took place on November 1 and 2, 1989.

The evidence before the court at the second 232 trial included the probation officer's report submitted to the court on November 23, 1988, in anticipation of the original hearing date of December 7, 1988. The probation officer had been unable to interview minor's parents because of inability to locate them; however, he had interviewed minor. Minor told the officer that his foster parents were his "mother and father" and that Susan and Duane P. (appellants) were "friends of his." He said that his friends visited him once a month and brought "their children." Minor identified the foster parents' children as his brother and sisters. The officer had also interviewed the foster parents, who stated that visits between minor and his parents were devoid of communication and emotion, and that minor often played with his parents as if they, too, were children. The foster parents also reported their feeling that minor had bonded to his foster family.

In his report to the trial court, the probation officer referred to three psychological evaluations which had been conducted and introduced as evidence at the time of the first section 232 proceeding in 1985. Dr. Proud had evaluated the parents to determine whether they were mentally deficient and whether they were capable of parenting minor appropriately. He had found that the father functioned at a normal intellectual level, while the mother was in the borderline range of mental ability. He had also concluded that the mother did not have the ability to function any better as a parent to minor, and that the father had an alcohol problem and did not possess the "emotional bonding or emotional competence to parent" minor. The other psychologists had concurred with Dr. Proud, one describing the parents as having extremely poor child rearing attitudes and minimal parenting potential.

Also in evidence at the section 232 trial was a current psychological report which included evaluations of minor and his parents. Dr. Kania reached much the same conclusions concerning the parents' intellectual functioning and ability to parent minor effectively as had the psychologists who evaluated them for the first section 232 action. He also opined that both parents suffered from psychological disorders—the mother from a mixed personality disorder and the father from a schizoid personality disorder—which significantly impaired "both parents' ability to establish a strong emotional bond with [minor], to accurately perceive his needs, and

to meet those needs." He concluded that these disorders were "enduring personality adjustments" which were unlikely to change in the foreseeable future, given the parents' "lack of motivation to change."

Dr. Kania found that minor considered his foster parents and their children to be his family, that he did not even consider his parents to be related to him, and that his sense of identity and security was bound up in his foster home. The doctor concluded that "to move [minor] from the [foster parents'] home . . . , after 6 1/2 years in their family, would cause serious psychological disruption and serious long-term consequences. This would be a difficult move, even if the home to which he was moved was ideal. However, this is certainly not the case. The [parents] appear unable to provide any of the necessary psychological support that would be necessary to aid [minor] make this adjustment. Moving [minor] from the [foster] home at this late date would cause serious long-term problems for him, not only as a child, but quite likely into and throughout his adult life."

Minor's social worker testified at the second section 232 trial. She related that minor's parents had visited minor three times in 1987, seven times in 1988, and five times in 1989.

Minor's parents also appeared as witnesses at the second 232 trial. The mother testified that she had gone to counseling, that she had visited minor regularly except during a period when the parents' car was broken down in 1989, and that she had completed the reunification plan given her in 1982. She also testified that she had taken and completed parenting classes according to the reunification plan. On cross-examination, however, it appeared that she thought her discussions with a social worker had constituted a parenting class.

Minor's father testified that he and his wife had reunited approximately six weeks before the trial. He recounted that he had been regularly employed as a trash hauler with the same company from before minor's birth until approximately 1988, when he became self-employed as a mobile mechanic, making about $400 take-home pay per month. He testified that he had never been given a reunification plan.

The final witness at the second section 232 trial was a family maintenance worker for DPSS, whose duties were to work with families of children who had been abused under an informal agreement so that the children would not have to be removed from their homes. She had been assigned to work with minor's parents from December of 1988 to June of 1989 after allegations were made that minor's father had physically abused one of his sisters. She worked with the parents to help them deal with the physical abuse

problem and make their house clean and safe. She was unsuccessful in trying to get minor's mother to maintain a clean and sanitary home—the last time she visited, in June of 1989, there were clothes piled up in the middle of the house, the house was in a state of disarray and very dirty. Her department offered minor's parents another agreement in June of 1989, but the parents refused it.

The trial court ruled that there was insufficient evidence to find that minor's parents had abandoned minor (§ 232, subd. (a)(1), or that they had been cruel and neglectful to him (§ 232, subd. (a)(2)). However, it ruled that there was sufficient evidence to support the third cause of action of the petition, finding: "there was an out-of-home placement over one year. Further, that a return of the child to the child's parents would be detrimental to the child. And, further, that the parents have failed during that period of time to maintain adequate parental relationship with the child and are likely to fail to do so in the future. [¶] This failure includes having both a suitable home and the ability to properly care for and control the child." The court also found that reasonable reunification services had been provided to or offered to the parents, designed to help the parents in overcoming the problems which had led to the dependency, but that despite these services return of the child to his parents' home would be detrimental to him. The court concluded that the least detrimental alternative to returning minor to his parents was termination of the parent-child relationship, and ordered such termination.

DISCUSSION

I.

RES JUDICATA EFFECT OF EARLIER LAW SUITS

■ The parents contend that the court's holdings in the earlier section 232 action and the guardianship proceeding were a bar to the second section 232 action, based on the doctrine of res judicata. As we explain below, we disagree.

Res judicata is not a jurisdictional defense, so that in order to constitute a bar, a prior judgment must be pleaded and proven at trial of the later action. (E.g., *Domestic & Foreign Petroleum Co., Ltd.* v. *Long* (1935) 4 Cal.2d 547, 562-563 [51 P.2d 73]; see Code Civ. Proc., § 1908.5; 7 Witkin, Cal. Procedure (3d. ed. 1985) Judgment, § 198, p. 636.) There is no indication in the record on appeal that this issue was ever raised at trial of this action.

Even had the parents raised such an issue at trial, we conclude that the earlier actions would not have precluded the action now before us. The guardianship action was decided in favor of DPSS, and the parents did not appeal from the decision in that action. This court later voided the letters of guardianship on the sole ground that the issuing court had no jurisdiction. Thus, no guardianship judgment stands as a bar to the present action. The earlier section 232 action concerned the time period covering the first 18 months of minor's dependency, while the present action covers approximately 6 years of dependency. Consequently, because the causes of action in the second section 232 petition are not the same as those of the first petition, and the issues raised in the second action were not actually litigated in the first action, there can be no collateral estoppel. (E.g., *Todhunter* v. *Smith* (1934) 219 Cal. 690, 695 [28 P.2d 916]; see 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 253, p. 691.)

## II.

### LAW OF THE CASE

■ The parents contend that "[t]he judgment appealed from violates the doctrine of law of the case, in that the opinion of the district court of appeals [*sic*] mandated the Riverside County Juvenile Court enter an order specifying the amount, duration and type of visitation between the minor and appellants, whereas the record shows no such reunification order." We beg to disagree with this assertion. As we noted in our statement of facts, above, the juvenile court included directions specifying the amount, duration and type of visitation to take place between minor and his parents in its order pursuant to the permanency planning hearing held after the letters of guardianship were declared void. Thus, it carried out this court's directive to the letter.

## III.

### APPLICATION OF SECTION 232.3

■ The parents contend that delay of the trial of this action violated the requirement of section 232.3 that a section 232 action be set for trial not more than 45 days after completion of service on the parties. As a corollary of this contention, they argue that DPSS "allowed this case to drift along on the trial calendar for a year," and whimsically pose the question, "What was the Department doing in the interim?" They submit that "reversal is the appropriate remedy for a delayed trial on stale facts."

As the record reveals, the trial of this action as originally set would have taken place within 45 days of service of the parents, had they kept their social worker apprised of their current address. Instead, they had apparently moved either two or three times without informing the worker, so that the sheriffs' deputies could not serve them and the probation officer could not locate them to interview them in preparation for trial. There is no indication that any of the subsequent delays in the trial were delaying tactics of DPSS, or that the parents objected to any of the continuances which the trial court granted. Indeed, approximately eight months' delay was caused by the parents' failure to report their current address and their due process right to have an attorney appointed for them. The rest of the delay appears to have been caused by the need for psychological evaluations and the difficulty of obtaining a trial judge. We find no authority which tells us that section 232.3 is a jurisdictional bar to suit; nor do we conclude that DPSS in any way sought to block speedy trial in this matter. The parents' contention is without merit.

IV.

SUFFICIENCY OF THE EVIDENCE

■ The parents contend that there was insufficient evidence to sustain the trial court's finding, pursuant to section 232, subdivision (a) (7), that minor had been in out-of-home placement for a one-year period. They argue that the one-year period should have been measured from the time this court's opinion in the appeal from the referral for guardianship became final on July 25, 1988, and point out that the second section 232 petition was filed only two and one-half months thereafter.

Section 232, subdivision (a)(7) applies to a child who "has been in out-of-home placement under the supervision of the juvenile court . . . for a one year period," and provides that the one-year period "shall be calculated from the date of the dispositional hearing at which the child was placed in out-of-home placement . . . ." The record reflects that the present section 232 action was filed some six years after the juvenile court first placed minor in out-of-home care under a dispositional order, and that minor never returned to live with his parents after his removal from their home. The juvenile court's order reinstating minor's dependency after the guardianship was voided related back to the date at which the dependency had been terminated, so that minor was in continual out-of-home placement pursuant to a dispositional order from the time he was first taken into care in 1982.

The parents also argue that DPSS should have been precluded from introducing any evidence which was before the court in the first section 232

proceeding, apparently relying once again on the doctrine of res judicata. We have already explained in section I of this discussion that res judicata and collateral estoppel do not apply in these circumstances. Finally, the parents maintain that DPSS did not provide them with adequate "visitation services," apparently based once again on their mistaken belief that the juvenile court did not formulate a specific order. However, as we noted in section II of this discussion, the juvenile court did make a specific order for visitation, and the record shows that the parents visited regularly with minor pursuant to this order.

The parents raise no other subissues related to the question of the sufficiency of the evidence to support the judgment. We conclude that there was substantial evidence of reasonable, credible and solid value such that the trial court could find that the termination of parental rights was appropriate based on clear and convincing evidence. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924 [171 Cal.Rptr. 637, 623 P.2d 198].)

V.

### EVALUATION OF SERVICES TO MOTHER

The parents contend that the trial court erred in not ascertaining whether services offered by the state through regional centers serving developmentally disabled persons might have enabled them to reunite with minor. They cite *In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1331 [255 Cal.Rptr. 498], which held that "the rights of a developmentally disabled person may not be terminated without first assessing whether the services offered by the state through regional centers may enable the family of a disabled person to remain intact." They argue that the mother had difficulty obtaining transportation and that, had she had access to transportation services offered by a regional center, she would have been able to keep up a parental relationship with minor so that he could be reintegrated into her home.

We note that the court in *Victoria M.* cites absolutely no authority, either statutory or judicial, for its holding that the court must consider what a state regional center might do for a developmentally disabled parent before declaring a child of that parent free from parental custody and control. We, in turn, have found no such authority. Moreover, we conclude that the holding in *Victoria M.* does not apply to the facts of this case.

The circumstances of *Victoria M.* were different from those of the case before us. The mother in *Victoria M.* had attended "special" classes throughout her schooling, had been tested as having an IQ as low as 58, had

been continually unable to provide her seven children with food or shelter, and had no husband or other partner to assist her in parenting. (*In re Victoria M.*, *supra*, 207 Cal.App.3d at pp. 1321-1322.) At the time of the section 232 hearing, none of her children were living with her. (*Id.*, at p. 1322.) The social worker knew from the outset that the mother had been evaluated to be mentally retarded. (*Id.*, at p. 1329.) She was already receiving services for a developmentally disabled son through the local regional center, and as part of her reunification plan the social worker required that she cooperate with the center; moreover, at some point she herself had become a client of the center, though not through a DPSS referral. (*Id.*, at p. 1322, 1330.) She was also required to find suitable housing for her children, but received no assistance from the department in doing so. (*Id.*, at p. 1323.) She tried very hard in a parenting skills class, but did very poorly in the class. (*Ibid.*) Reunification services were discontinued for the mother only eight months after her seven children were removed from her care. (*Id.*, at p. 1328.)

In contrast, the mother in the present case had a regularly employed husband of normal intelligence assisting her in maintaining a home, except for a brief period of separation in 1989. While she functioned on the borderline of normal mental ability and suffered from chronic mental problems, at no time after minor was removed from her home did the juvenile court find it necessary to remove from her care the other three children residing in her home. There is no indication in the record that she in fact qualified for services which could have been provided by a regional center. While the mother in *Victoria M.* apparently received no specially tailored assistance in maintaining her home or caring for her children, minor's mother received special assistance from minor's foster parents (registered nurses), the public health nurse, a DPSS volunteer, a DPSS family maintenance worker and minor's social worker. The mother was provided with services to assist her in caring for minor over a period of several years. The record reflects that minor's mother's problem was less a function of lack of mental ability than of poor attitude and lack of motivation to parent a fragile child with special health needs.

In our view, the pertinent question to be raised to this court is not whether the trial court should have evaluated whether minor's mother would have benefitted from the services of a regional center, but whether there was sufficient evidence adduced at trial to support the court's finding that DPSS had offered the parents adequate reunification services. (See *In re Angelia P.*, *supra*, 28 Cal.3d at p. 904.) We conclude that DPSS did so, with juvenile court approval. The parents were counseled over and over again concerning the things they needed to do to safeguard minor's delicate health and to provide him with a safe environment. They did these things when

under close supervision, proving that they had the ability to do them, but neglected to do them when not so supervised. They were given ample access to visitation, and the record shows that, with a few lapses caused by transportation difficulties, they visited fairly regularly, yet they did not develop a close bond with their child. No showing has been made that the fact that the parents sometimes had car trouble was a block to their developing this bond. The mother apparently made good progress in individual counseling, but there is no indication that she completed the counseling program or that she ever enrolled in parenting classes.

## DISPOSITION

The judgment is affirmed.

Hollenhorst, Acting P. J., and McDaniel, J.,* concurred.

Appellants' petition for review by the Supreme Court was denied May 23, 1991.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.