[No. D013990. Fourth Dist., Div. One. Feb. 4, 1992.]

In re CHRISTINA L., a Minor.
SAN DIEGO DEPARTMENT OF SOCIAL SERVICES, Petitioner and
Respondent, v.
JULIE B., Objector and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of *parts I and II B.*

OUNSEL

iriam R. Kennedy, under appointment by the Court of Appeal, for Objector d Appellant.

oyd M. Harmon, Jr., County Counsel, Susan Strom, Chief Deputy County unsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Peti-ner and Respondent.

lerie Newton, under appointment by the Court of Appeal, for Minor.

## OPINION

HUFFMAN, J.—Julie B. (Mother) appeals the judgment of the juvenile court terminating her parental rights concerning her daughter, Christina L., pursuant to Civil Code section 232. Mother contends the juvenile court erred in overruling her demurrer and motion to dismiss the petition, in which she argued she received inadequate notice of the allegations on which the petition was based, due to form pleading of the statutory language in the petition. Mother also argues the focus of the proceedings was improperly shifted from the original grounds upon which dependency was established, an unsanitary home environment, to new allegations of a lack of a parental relationship with Christina. (*In re Venita L.* (1987) 191 Cal.App.3d 1229 [236 Cal.Rptr. 859].) Mother further argues the record contains insufficient evidence to support two findings made by the trial court in connection with the judgment: reasonable reunification services were offered to Mother, and Mother would fail to develop an adequate parental relationship with Christina in the future.

After first finding no notice defect and no deprivation of due process in the manner in which this petition was pled and pursued, when the factual and procedural background of the entire case is considered, we shall conclude the reunification services offered were reasonable under all the circumstances of the case. ( Civ. Code, § 232, subd. (a)(7).) We also find the record supports the juvenile court's determination that Mother was likely to fail in the future to maintain an adequate parental relationship with the child. (*Ibid.*) We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The probation officer's "FREE FROM CUSTODY AND CONTROL REPORT" filed in support of the petition to terminate parental rights (brought under Civ. Code, § 232, subd. (a)(2) [cruel treatment and/or neglect by the mother] and subdivision (a)(7) [out of home placement of a dependent child for more than one year with detriment upon any return to her mother]) provides the following summary of Christina's history.[2] She was born on January 14, 1986. An initial petition to establish a dependency for Christina was filed in

---

[2]Additional allegations under Civil Code section 232, subdivision (a)(1), abandonment of the child, and subdivision (a)(7) were alleged against her father, Scott Robert L. Scott, and Mother, who were never married, formerly lived together in a group home for developmentally disabled persons, and later lived together in an apartment at the time Christina was born. Scott moved out of the apartment about a year after her birth and has never complied with any reunification plans. He has consented to Christina's adoption and is not a party to this appeal.

December 1986 under Welfare and Institutions Code section 300, subdivision (a)[3] (alleging there was no parent willing or able to exercise control over her), but it was dismissed in January 1987. Later, anonymous complaints were received by the child abuse hotline that Mother's house was filthy, that she was screaming at the baby, and that Mother was claiming Christina had been abused and molested by her father. On June 29, 1988, San Diego County Sheriff's officers responded to an anonymous complaint concerning Mother's home. Christina, then age two and one-half, was taken into custody, due to home conditions that were unfit for occupancy (rotting walls, unusable toilet and bathtub, mold and mildew, soaked carpeting, open pipes, et cetera).

A petition was again filed to establish a dependency on behalf of Christina under section 300, subdivision (a), alleging she had no parent or guardian willing or capable to exercise care and control, based on the filthy and unsanitary conditions of the home which endangered her well-being. Christina was detained out of the home pending and after the detention hearing. At a hearing held in July 1988, Mother entered a nolo contendere plea and visitation was ordered. At the jurisdictional hearing held on August 25, 1988, Christina was declared a dependent child of the juvenile court and was placed in licensed foster care.[4] Mother was ordered to follow a reunification plan, which included submitting to a psychological evaluation, participating in parenting class, and receiving instruction on housekeeping. She was required to maintain a consistent residence in a clean and organized manner, including obtaining adequate furniture, bathroom and kitchen facilities, and food supply. Supervised visitation was ordered. Although Mother refused to sign the reunification plan, she did make some efforts to comply with it.

Initial visitation with Christina did not go well. When Christina first saw her mother and grandmother, with whom her mother lived, she cried, would not let go of her foster mother, and would not go near either her mother or her grandmother. The social worker consulted a psychologist in August 1988 about Christina's behavior when she saw her mother, and was told there seemed to be low bonding between Christina and her mother due to environmental deprivation in the home, which produced signs of fear in Christina. Another psychologist confirmed at that time that Christina's acting out during the visits with her mother could be a reaction showing she did not want to return to the home environment from which she was taken. Later

---

[3] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[4] Because Christina was declared a dependent child before January 1, 1989, new section 366.26 does not apply. These proceedings for freedom from custody and control were accordingly conducted under Civil Code section 232. However, the principles discussed herein should apply equally to the new law.

visitation with Mother and the grandmother seemed to cause acting-out behavior in Christina, such as hitting and biting, and by November 1988 Christina had been moved to several different foster homes.

In compliance with her reunification plan, Mother submitted to a psychological evaluation in September 1988. She was diagnosed as suffering from mild to moderate mental retardation, with depressive tendencies. The psychologist, Dr. Zapinsky, found her unable to grapple with the magnitude of the problems that led to her daughter being removed from her care. Mother blamed the police for Christina's removal, and blamed her own absent father for the condition of the house. Dr. Zapinsky also assessed the interaction between mother and daughter. Christina's initial reaction toward Mother was one of dismay. Mother seemed oblivious of the effect she created on her daughter by continually hugging and kissing her, causing a reaction on Christina's part which "seemed to verge on a lifeless, paralytic shock." Christina was also separately evaluated, and found to be a traumatized child who was in need of special parenting. There was "little sign of Christina's bonding to her natural mother." Instead, Mother's clinging to her daughter seemed to produce quiet panic and progressive withdrawal on the part of the daughter.

Jill Johnson, a department of social services (the Department) social worker, handled the case from September 1988 through December 1989, while it was in reunification status. She testified at trial on the petition for freedom from parental custody and control (Civ. Code, § 232) that although she did not have any particular expertise in services for the developmentally disabled in San Diego, she had worked with such adults and children for five years in Washington State. She had initial discussions with Mother in October, November and December 1988 about appropriate reunification services, including proposed use of adult protective services as well as the San Diego Regional Center, a government agency which provides assistance to developmentally delayed adults who request such services. Johnson was aware that Mother had been a regional center client while she was in high school. However, Mother told her she did not need any more social workers and did not need other services.

Mother also told the social worker that she only wanted to work on one thing at a time on her reunification plan, even though, in the social worker's opinion, Mother was capable of working on more than one component of the plan at once. She first completed a parenting class in December 1988; visitation did not improve and it was unclear if she learned anything from class. She also worked with a social services agency, New Alternatives, which assisted her in fixing up the dilapidated house. The New Alternatives

social worker also worked with Mother on parenting issues at her request. Jill Johnson then obtained a therapy referral for Mother to Dr. Dicicco, a clinical psychologist with expertise in working with developmentally delayed adults.

Mother began therapy sessions with Dr. Dicicco in March 1989. The therapeutic goals were to help Mother become a better parent and to assist her in reunifying with her daughter and separating from her own mother, on whom she was very dependent.[5] Dr. Dicicco saw Mother, the grandmother, and Christina together for a few therapy sessions, but found that Christina's language was still limited and that, at three and one-half years of age, she was hard to understand. Consequently, he did not continue to treat Christina. He believed Christina's developmental delays and behavior problems could pose difficulties for Mother if she were to regain custody.

After Mother first saw Dr. Dicicco for four sessions, she quit, believing she was not required to participate in therapy any longer. After three months, Mother resumed therapy for about eight months. However, Dr. Dicicco testified at trial that Mother's emotional problems, which he viewed as separate from her developmental disability, prevented her from getting more help from the services offered to her. He believed his involvement as a therapist came too late in the reunification process to do much good. He explained that for his services to be helpful, there would have to have been more bonding already between mother and child. He found that Mother, who had a tendency to be distrustful, distrusted him as part of the system, which interfered with the therapeutic process. At the court's questioning, Dr. Dicicco indicated that Mother would have to be motivated and participate in any available services in order to obtain any value out of them.

As shown in dependency records supplied to this court in the form of an augmentation of our record, Mother was still refusing in early 1989 to return to the regional center for assistance in her reunification efforts. A dependency minute order of February 24, 1989, shows she was ordered to submit to a developmental evaluation through the regional center before reunification could take place.[6] On May 23, 1989, Mother's attorney scheduled a special hearing to inquire into why the Department had not yet obtained the

---

[5]The probation officer's report on freedom from custody and control includes additional information on Christina's maternal grandmother, with whom Mother lived and on whom she depended for support and direction. This evaluation shows that the grandmother was psychologically evaluated in 1986 as showing impaired insight and judgment, and was diagnosed as suffering from a mixed organic brain syndrome and an IQ of 92.

[6]Pursuant to Mother's request in her opening brief, this court has taken judicial notice of our records in the underlying appeal by Mother of a permanency planning hearing order which directed the Department to initiate the freedom from custody and control proceedings. Our opinion dismissed the appeal and treated the matter as a petition for extraordinary relief, which was denied. (Evid. Code, § 452, subd. (d)(1).)

evaluation from the regional center. Together, Mother's attorney and the social worker convinced Mother to apply for regional center services, and the hearing was taken off calendar. After some delay, a regional center referral to a contracting agency, Toward Maximum Independence, was obtained to assist Mother in moving from the substandard home (which she accomplished by August 1989). The Toward Maximum Independence social worker also agreed to supervise visitation and to offer parenting training. These efforts began in July 1989 and continued for a month or two, until Mother stopped cooperating and the agency refused to provide further services.

In a supplemental report prepared in September 1989 summarizing the reunification services provided to date, the probation officer reported that services particularly appropriate to a developmentally disabled person had only recently begun (approximately July 1989). The worker further noted that reunification should now be considered questionable because Mother would no longer cooperate with Toward Maximum Independence, and more time was needed to find another appropriate social service agency. Meanwhile, the 18-month period for the provision of reunification services (§ 361.5, subd. (a)) would end in December 1989. An adoption assessment, to supplement one already prepared, was requested at that time.

Mother regularly visited Christina from June 1989 through mid-August. During late August and September 1989, Mother stopped visiting. During the period of no visitation, Christina's teachers noticed that her attitude and behavior seemed to improve. When visitation resumed in late September 1989, Christina became moody, withdrawn, defensive, and argumentative. By November 1989, Christina did not want to visit Mother.

A second psychological evaluation of both mother and daughter was performed in October and November 1989. Mother showed herself to be somewhat delusional; she believed that case aides had guns and wanted to hurt her. The examiner concluded that although Mother had some limited understanding of appropriate parenting techniques, she was still far too concrete in her thinking to be flexible to the rigorous demands of a young child, especially a child who had special needs herself. In his examination of Christina, the evaluator found she had limited speech skills and suffered an adjustment disorder with mixed emotional features. She was found to be suffering from a nonorganic failure to thrive which adversely affected her psychological development and ability to form attachments.

At a review hearing in the dependency matter held in December 1989, Christina was continued as a dependent of the juvenile court, placed in foster

care. A permanent plan of adoption was ordered and court-mandated reunification services were terminated.

Approximately five months later, the Department filed its petition for freedom from custody and control. Trial commenced in December 1990, and concluded on February 8, 1991. At trial, the juvenile court received into evidence the probation officer's report and its attachments. (Civ. Code, § 233.) The court reviewed the juvenile dependency file for the limited purpose of assessing the reasonableness of the services provided to Mother. (Civ. Code, § 232, subd. (a)(7).)

Testimony was taken from social worker Jill Johnson, who summarized the efforts made and stated she did not know of any available appropriate services that were not offered to Mother. However, she noted that if Mother had been involved with the regional center earlier, it was possible there might have been some other services, such as in-home visits by an agency called A.R.C. However, she doubted that would have been enough, due to the limited nature of those visits (two hours/week). She reiterated that the reason for the delay from August 1988 through April 1989 in providing services to Mother that were characterized by expertise with developmentally delayed persons was Mother's resistance to therapy, her refusal to request regional center services and her refusal of its outreach effort, and her desire to do one thing at a time on her reunification plan. There was a "log jam" for a while since Mother would not go in and the regional center would not come out. Eventually, Johnson made a referral for therapy although Mother was still resistant to it.

Dr. Dicicco testified that the only appropriate service he could think of that was not provided was a residential facility where she could live with her daughter; however, he had no knowledge of whether such a facility existed. Johnson testified there was no such facility in San Diego County.

Christina's therapist, who had been seeing her since January 1990, testified that Christina had no attachment or bond to Mother, and it would be detrimental to return her to Mother's custody.

An adoptions worker was called to testify that in preparing her assessment, she had not visited Mother's current home and had no information it was not clean and sanitary. Her current recommendation for adoption was not based on the cleanliness of the home.

In her testimony, Mother told the juvenile court that she and Christina were bonded as mother and daughter. She explained she had initially refused

to go to the regional center because she felt they were not very helpful to her.

In closing argument, Mother's attorney contended the Department did not go out of its way to provide adequate services that were suited to Mother's strengths and weaknesses. He noted Dr. Dicicco had said that adequate services that would address Mother's problems did not seem to be available. The attorney claimed that social worker Johnson's efforts to provide services did not conform with what Dr. Dicicco thought were necessary.

Agreeing with Mother's attorney that this was a tragic situation, the juvenile court found that reasonable efforts had been made to reunify mother and daughter, and no adequate parental relationship now existed nor was expected to be existing in the future. The court sustained the petition as to Mother under Civil Code section 232, subdivisions (a)(2) and (a)(7), on the grounds that clear and convincing evidence supported the findings. Christina was referred for adoptive placement.

Mother timely appealed the judgment terminating her parental rights.

## DISCUSSION

We shall first address Mother's two related claims that she was afforded inadequate notice of the specific facts alleged by the manner in which the petition was pled, and by the gradual evolution of the case from a "filthy house" case to allegations of a lack of parental relationship. In part II, *post*, we shall discuss the extent to which the record supports the juvenile court's findings that reasonable services were offered to Mother, and she would fail to develop an adequate parental relationship with Christina in the future.

### I*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II

### A

### *Sufficiency of the Evidence*

In reviewing Mother's claims that insufficient evidence supports the trial court's findings that reasonable services were offered to Mother to assist

*See footnote 1, *ante*, page 404.

her in reunifying with Christina, and that it was likely that Mother would fail to develop an adequate parental relationship in the future, this court must determine whether there is any substantial evidence to support the trial court's findings, made by its application of the proper standard. (*In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1326 [255 Cal.Rptr. 498].) In making this determination, "we must decide if the evidence is reasonable, credible and of solid value—such that a reasonable trier of fact could find that termination of parental rights is appropriate based on clear and convincing evidence. [Citation.]" (*Ibid.*)

Mother first claims the child welfare services that were offered and provided to her did not adequately account for her special needs as a developmentally disabled person. The parenting class that she took was not specialized for such parents; the in-home visits provided by the agency "New Alternatives" to assist her in improving her household conditions were not geared toward disabled persons; and pressure to make Mother seek specialized services from the regional center was not applied on her until May 1989, when her attorney scheduled a hearing to inquire into why such an evaluation had not been performed as ordered. Mother contends these services do not meet the tests set forth in case law that, under section 361.5, reunification plans "must be appropriate for each family and be based on the unique facts relating to that family." (*In re Edward C.* (1981) 126 Cal.App.3d 193, 205 [178 Cal.Rptr. 694]; *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1458 [234 Cal.Rptr. 84].) ▮ The Department is required to make a good faith effort to develop and implement a family reunification plan where out-of-home foster care is ordered in a section 300, subdivision (a) case (*In re John B.* (1984) 159 Cal.App.3d 268, 275 [205 Cal.Rptr. 321]). Such a plan must have the objective of providing such services or counseling "as will lead to the resumption of a normal family relationship." (*In re Jamie M.*, (1982) 134 Cal.App.3d 530, 545 [184 Cal.Rptr. 778]; § 362, subd. (c).)

It is equally well established that "[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent. (*In re Lynna B.* [1979] 92 Cal.App.3d [682,] 702 [155 Cal.Rptr. 256].)" (*In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220 [259 Cal.Rptr. 863].) In *In re Michael S.*, *supra*, 188 Cal.App.3d 1448, 1463, footnote 5, the court noted: "The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency of his or her minor children is not a requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions. A parent whose children have been adjudged dependents of the juvenile court is on notice of the conduct requiring such state intervention. If such a parent in no way seeks to correct his or her own behavior or waits until the impetus of an

impending court hearing to attempt to do so, the legislative purpose of providing safe and stable environments for children is not served by forcing the juvenile court to go 'on hold' while the parent makes another stab at compliance."

■ The difficulty in applying these principles here stems from the fact that Mother suffers from a developmental disability as well as emotional problems, and has been psychologically evaluated as lacking judgment and insight into her problems. However, a parent under such circumstances is not excused from the statutory requirement of a reunification plan. In a proceeding for freedom from custody and control, the focus must be on the best interests of the child. (Civ. Code, § 232, subd. (b).)[8] Some capacity on the part of the parent to comply with an appropriate reunification plan is presumed. Civil Code section 232, subdivision (a)(7), specifically pertaining to the provision of reunification services, provides guidance as to the applicable standard: "If the minor has been adjudged to be a dependent child of the court pursuant to Section 300 of the Welfare and Institutions Code, the court shall review and consider the contents of the juvenile court file in determining if the services offered were reasonable *under the circumstances*." (Italics added.)[9]

---

[8]Here, the Department did not plead any allegations that Mother's parental rights should be terminated under Civil Code section 232, subdivision (a)(6), the provision which deals with a mentally disabled parent and requires such disability to be proved in a prescribed manner. However, as noted by the court in *In re Victoria M., supra*, 207 Cal.App.3d at pages 1331-1333, Civil Code section 232, subdivision (a)(6) is not the exclusive means for terminating the parental rights of a mentally disabled person. "If the petitioner can sustain its burden under [Civil Code section 232,] subdivision (a)(7), including reunification services designed with the family of a mentally disabled parent in mind, [Civil Code section 232,] subdivision (a)(7) is an appropriate procedure." (*Id.* at p. 1332.)

[9]Civil Code section 232, subdivision (a)(7) provides in pertinent part that parental rights may be terminated as to a child: "Who has been in out-of-home placement under the supervision of the juvenile court, the county welfare department, or other public or private licensed child-placing agency for a one-year period, if the court finds that return of the child to the child's parent or parents would be detrimental to the child and that the parent or parents have failed during that period, and are likely to fail in the future, to maintain an adequate parental relationship with the child, which includes providing both a home and care and control for the child.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"The court shall make a determination that reasonable services have been provided or offered to the parents which were designed to aid the parents to overcome the problems which led to the deprivation or continued loss of custody and that despite the availability of these services, return of the child to the parents would be detrimental to the child. The probation officer or social worker currently assigned to the case of the child shall appear at the termination proceedings.

"If the minor has been adjudged to be a dependent child of the court pursuant to Section 300 of the Welfare and Institutions Code, the court shall review and consider the contents of

Accordingly, where termination of the parental rights of such a parent is a possibility, the Department and the juvenile court are required to tailor the reunification plan to accommodate his or her special problems and limitations. (*In re Victoria M., supra*, 207 Cal.App.3d 1317, 1329-1333.) "[I]f the fundamental inadequacy of the parent is a developmental disability, it must be demonstrated under any of the subdivisions of [Civil Code] section 232 that the court explored alternatives to severance, such as services offered by the state for developmentally disabled persons." (*Id.* at p. 1333.) Of course, the main inquiry remains whether the juvenile court has a sufficient basis to conclude adequate reunification services were offered. (*In re Walter P.* (1991) 228 Cal.App.3d 113, 129 [278 Cal.Rptr. 602].)

■ Thus, at the stage of the proceedings when a trial on a petition for freedom from custody and control is underway, the court is required under Civil Code section 232, subdivision (a)(7) to evaluate whether the reunification services that were offered were reasonable "under the circumstances." Such circumstances necessarily include the mental condition of the parent, her insight into the family's problems, and her willingness to accept and participate in appropriate services. No reason is apparent here why the general principle that a party should not sleep on her rights does not apply. (Civ. Code, § 3527.) If Mother felt during the reunification period that the services offered her were inadequate, she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan: " 'The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.' [Citation.]" (*Sommer v. Martin* (1921) 55 Cal.App. 603, 610 [204 P. 33].)

In this case, although Mother's counsel vigorously argued the issue of the allegedly inappropriate services at the trial on the petition for freedom from custody and control, the reunification period had already long passed, along with the opportunity to timely correct any inadequacies. Although Mother's counsel in the dependency matter commendably took the initiative of pressuring her to obtain regional center services in May 1989, by then Christina had already been out of the home for almost a year, and the reunification goal was daily becoming more remote.

In *In re Misako R.* (1991) 2 Cal.App.4th 538 [3 Cal.Rptr.2d 217], an appeal of a dependency order for long-term foster care and termination of

the juvenile court file in determining if the services offered were reasonable *under the circumstances.*" (Italics added.)

reunification services, this court analyzed a similar claim that inadequate services were provided to a mildly retarded mother (also suffering from a language barrier) who had resisted taking advantage of available services. We commented: "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Id.*, at p. 547).

Faced with a similar problem in *In re Laura F.* (1983) 33 Cal.3d 826, 838-839 [191 Cal.Rptr. 464, 662 P.2d 922], the Supreme Court found the record supported a trial court's conclusion that a child protective services department had done " 'all that is reasonably possible to do in order to help the mother accomplish the return of her children.' " (*Id.* at p. 839.) The court found that in light of the three years of counseling and advisement by social workers that the mother had undergone, "[h]er failure to win back the children indicates her lack of interest or capacity rather than the inadequacy of the services offered." (*Ibid.*)

In the case before us, the circumstances under which the services were provided included not only Mother's developmental disability and emotional problems, but also her persistent refusal to apply to the regional center for the voluntary services that it provided to developmentally disabled persons. Even though this record shows the social worker on the case did not profess expertise in services locally available to developmentally delayed adults, she consistently asked Mother beginning in the fall of 1988 to voluntarily seek assistance from the regional center as part of her reunification plan. Mother refused to do so until her attorney took the initiative of setting a court hearing specifically for the purpose of enforcing an order that she do so, in May of 1989. Under pressure, Mother then agreed to apply for services. However, once she began working with the agency which contracted with the regional center, Towards Maximum Independence, she was able to cooperate with its social worker only for a period of about two months. Mother also showed resistance to therapy, even with a therapist specifically trained in working with developmentally disabled clients. She consistently told the social worker that she only felt she was able to work on one component of her reunification plan at a time, even though the social worker believed, based on Mother's lifestyle, that she was able to accomplish more than that.

This record as a whole shows the Department, faced with these problems, made a "good faith effort to develop and implement a family reunification plan" (*In re John B.*, *supra*, 159 Cal.App.3d 268, 275) and thereby satisfied

its statutory duty. (§ 361.5; Cal. Rules of Court, rule 1456(e).) As Dr. Dicicco responded to the juvenile court's inquiries concerning Mother's participation in the services, in order for her to obtain any value from the services, some motivation and participation on her part, to the extent of her ability, was required. The record supports the trial court's conclusion that reasonable services were provided under all the circumstances.

B*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

DISPOSITION

The judgment is affirmed.

Kremer, P. J., and Nares, J., concurred.

---

*See footnote 1, *ante,* page 404.