[No. B051004. Second Dist., Div. Seven. Oct. 2, 1991.]

In re RICHARD H. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN'S
SERVICES, Plaintiff and Respondent, v.
RICHARD H., Defendant and Appellant.

**COUNSEL**

Michael D. Randall, under appointment by the Court of Appeal, for Defendant and Appellant.

De Witt W. Clinton, County Counsel, Rosanne Y. Lin, Jones, Day, Reavis & Pogue and Elwood G. Lui for Plaintiff and Respondent.

**OPINION**

**WOODS (Fred), J.**—A father appeals from the order declaring his minor sons to be dependents of the court pursuant to Welfare and Institutions Code

section[1] 300. Appellant asserts that the court made many errors in ruling on the dependency petition of the department of children's services (DCS). We affirm.

FACTUAL AND PROCEDURAL SYNOPSIS

I. *Detention*

On April 25, 1989, the Los Angeles Police Department detained 19-month-old Richard H. and 4-month-old Christopher H. (Minors) after Christopher had been brought to the emergency room of the California Medical Center in a comatose state.

On April 27, 1989,[2] DCS filed a petition pursuant to section 300 which alleged, among other things, that Christopher's condition had been caused by his parents, appellant and Yvette B., and that the Minors had been exposed to violence. A hearing was held on April 28, 1989, and the court ordered Christopher detained in the hospital and Richard detained in the home of his aunt and uncle. The court also ordered DCS to prepare a prerelease investigation (PRI) report on appellant's home and set hearings for May 9, 1989, and June 2, 1989.

At the June 2, 1989, hearing, the court ordered that the Minors remain detained and set a hearing date of July 6, 1989, at which time, the court set an adjudication hearing for August 16, 1989.

II. *Adjudication*

A. *Hearings*

Both parents failed to appear for the adjudication set for August 16, 1989, and the court set hearings for October 18, 1989, and November 2, 1989. At the November 2, 1989, hearing, the mother moved for a continuance to November 17, 1989. At the November 17, 1989, hearing, the court continued the adjudication to January 8, 1990.

B. *Evidence received*

1. *PRI Report*

The PRI report on appellant's home recommended that the Minors not be placed with appellant since he was often not at home. The report noted that

---

[1]Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.

[2]An amended petition was filed on August 16, 1989.

the Minors needed to be attended to on a constant basis because of their young age and medical problems. Appellant did not have a job and admitted that his occasional use of alcohol would hinder his ability to provide adequate care and supervision of the Minors.

### 2. *Testimony of Roberta B.*

Ms. B. is the Minors' maternal aunt. Ms. B. and her husband helped care for the Minors. She testified that Christopher began exhibiting signs of his injuries on April 15, 1990. On April 16, 1990, when it became evident that Christopher was seriously ill, when both parents picked up the Minors, Ms. B. told them to take Christopher to the hospital.

The Minors lived with their mother at their maternal grandmother's house; the Minors did not live with appellant. During the following week, Ms. B. had frequent contact with the Minors' parents.

On at least one other occasion, appellant ignored her pleas to obtain medical help for the infant, even though the child's condition grew noticeably worse. Appellant told Ms. B. that he had not taken Christopher to the hospital because he "saw bruises on [Christopher] and he didn't . . . want Yvette to get in trouble for child abuse."

When Christopher woke up, his eyes would roll backwards. Between April 17, 1989, and April 25, 1989, the date when his aunt and uncle took Christopher to the hospital after receiving a call for help from his mother, Christopher was sleeping for abnormally long periods of time.

### 3. *Testimony of Leonard B.*

Mr. B. is the Minors' maternal uncle. In early 1989, Mr. B. saw appellant pushing and pulling the Minors' mother while she was holding baby Christopher in her arms. This type of incident happened "all the time." The parents would frequently expose the Minors to their arguments, especially when appellant was intoxicated.

Although the mother lived with the Minors' maternal grandmother during the month of April 1989, she periodically stayed with appellant. To Mr. B.'s knowledge, no one else had Christopher besides the parents before April 15, 1989. Mr. B. explained that during the week prior to April 15, 1989, he saw the children with both parents at the same time. Mr. B. also saw the Minors with both parents at the same time during the week of April 15, 1989.

### 4. *Testimony of Dr. Ellis Beasley*

Dr. Beasley was the physician who treated Christopher upon admission to the hospital. He testified that Christopher had two injuries to his head, each of which had occurred independently: a parietal skull fracture and a subdural hematoma. The fracture was so severe, it could only have been caused by blunt trauma to the head with an instrument or by hitting the baby's head against a hard object. As for the subdural hematoma, the doctor explained that the injury was a collection of blood between the cranium and the brain caused by a tear in a blood vessel on the brain. Since a subdural hematoma could not occur spontaneously, the doctor concluded that the injury was probably caused by blunt trauma to the head or by shaking the child with a front and back motion.

The doctor explained the reason for Christopher's comatose state. Dr. Beasley testified that if a child was still being shaken after his brain's blood vessel had burst, the child would lapse into a coma. According to Dr. Beasley, the child would initially be unusually irritable, fussy and unable to eat. As the child's condition deteriorated, he would have seizures, evidenced by the eyes rolling back in the head.

### C. *Findings*

At the conclusion of the hearing, the court found the Minors to be persons described by section 300, subdivisions (a), (b), (c) and (j).[3] As to appellant, the court sustained counts I and IV. Those counts stated that:

"Count I: On or about April 24, 1989, minor Christopher was hospitalized as a result of a detrimental condition and injury consisting of, but not limited to a contusion to the left side of the head and seizures consistent with shaken child syndrome. Such condition would not ordinarily occur except as the result of unreasonable and/or neglectful acts or omissions by minor's parents. Said abuse to minor, Christopher, endangers the physical and emotional health and safety of minor, Richard."

"Count IV: Minors have been periodically exposed to violent confrontations between their parents that endanger their physical and emotional safety."

---

[3]In general terms, these subdivisions cover minors who: (a) suffer or will suffer severe physical harm of a nonaccidental nature; (b) suffer or will suffer serious physical harm as the result of a parent's willful or negligent failure to supervise; (c) are at risk of serious emotional damage; and (j) whose sibling has been abused or neglected.

III. *Disposition*

A. *The Hearings*

On February 8, 1990, the court held the disposition hearing. The parents disagreed with the social worker's recommendation and requested a contested disposition hearing, which was set for April 3, 1990.

B. *Evidence received*

1. *DCS's reports*

DCS submitted two reports—a supplemental report by Byford Singleton and a preadjudication social study report prepared by Emmett Jones (the social study). The Singleton report stated that both parents refused to admit any knowledge as to how Christopher was injured. The report also expressed concern about the developmental delay of Minors' mother.

The social study noted that the Minors' maternal grandfather, aunt and uncle had reported that the parents had severely neglected the Minors by taking aid to families with dependent children (A.F.D.C.) funds and using that money "to support their partying life style" and the day following the parents' receipt of the A.F.D.C. funds, it would be necessary for other family members to provide food, Pampers and clothing for the Minors. The social study recommended reunification for both parents.

2. *Testimony of Byford Singleton*

Singleton, the DCS social worker who prepared the supplemental report, explained his comment about the parents' refusal to take responsibility for causing Christopher's injuries. According to Singleton, the parents' denial made it unsafe for the Minors to go home.

3. *Testimony of Andy Boczan*

Boczan was the DCS social worker who visited the Minors in their caretakers' home, took them to their doctors and contacted their parents. He noted that the damage to Christopher's brain required the child to undergo eye surgery and extensive treatment.

In a telephone conversation, Boczan found that appellant was totally irrational—appellant was incoherent, screamed, fought for the phone with a

man named Duane and spoke rapidly. Boczan thought that appellant might have been on some substance.

Appellant and Minors' mother agreed to attend a parenting class and a drug program. Boczan provided the parents with transportation money and told them that the money was to be used only for attendance at the drug program at the House of Uhuru and that they would have to provide him with a record of their attendance at the program.

Appellant later told Boczan that he had completed the drug program and promised to come in the next day with verification. Contrary to his promise, appellant failed to appear. In Boczan's opinion, appellant's failure to go to the drug program was a sign of irresponsibility.

The mother had a developmental disability which made her passive and incoherent. Appellant was extremely dominating over the mother.

### 4. *Appellant's testimony*

Appellant admitted that although he had accepted transportation money from Boczan, he never attended drug counseling. Appellant admitted that he had used the money for purposes other than those authorized by Boczan, i.e., for bus fare to look for work and to attend counseling.

Appellant claimed to have attended a parenting class. Upon questioning, it became evident that he had waited a month before enrolling in the class, the class he enrolled in was not authorized by DCS, and so far, he had completed only one month of the six-month class.

Appellant did not have a job.

### 5. *Testimony of Yvette B.*

The Minors' mother testified that appellant used part of the money provided for transportation to buy food.

### C. *Findings*

After the contested hearing, the court adjudged the Minors to be dependent children of the juvenile court and ordered DCS to place them outside of their parents' custody.

Appellant filed a timely notice of appeal.

CONTENTIONS

1. The court erred in failing to determine its jurisdiction within six months as required by section 352.

2. The court erred in sustaining the petition as there was no evidence to support the allegations.

3. The court erred in failing to place the Minors in appellant's home.

4. The court erred in making a finding of reasonable efforts when there was no evidence that any meaningful services had been provided to appellant.

5. The court erred in failing to appoint separate counsel for Minors.

DISCUSSION

I. *The continuances of the adjudication and disposition hearings provide no basis for the dismissal of the petition.*

██ Appellant contends that the court violated the six-month time limit of section 352, subdivision (b)[4] and the ten-judicial days time limit of section 358, subdivision (a)(1).[5] Appellant suggests that the court must dismiss the petition after six months have elapsed from the time of detention because the court exceeded those time limits.

In the instant case, the Minors were ordered detained on April 28, 1989, the adjudication hearing was held on January 8 and 9, 1990, and the contested disposition hearing was held on April 3, 1990. Thus, the adjudication occurred almost nine months after the Minors' ordered detention pursuant to section 319, and the disposition hearing occurred almost one year after detention and more than fifty judicial days after the adjudication.

---

[4]Section 352, subdivision (b) provides that:
"Notwithstanding any other provision of law, if a minor has been removed from the parents' or guardians' custody, no continuance shall be granted that would result in the dispositional hearing, held pursuant to Section 361, being completed longer than 60 days after the hearing at which the minor was ordered removed or detained, unless the court finds that there are exceptional circumstances requiring such a continuance. The facts supporting such a continuance shall be entered upon the minutes of the court. In no event shall the court grant continuances that would cause the hearing pursuant to Section 361 to be completed more than six months after the hearing pursuant to Section 319."

[5]Section 358, subdivision (a)(1) provides that the disposition hearing must occur within 10 judicial days of the adjudication.

A. *There is no requirement that the petition be dismissed if the time limits are not met.*

"The paramount purpose underlying dependency proceedings is the protection of the child." (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214 [272 Cal.Rptr. 316].) In *In re Charles B.* (1986) 189 Cal.App.3d 1204 [235 Cal.Rptr. 1], the court noted that before a court dismisses a dependency petition, it "must find (1) the dismissal is in the interests of justice and (2) the welfare of the minor requires dismissal." (*Id.*, at p. 1211, fn. 9.) The court held that "[a] dismissal based solely on the late filing of a progress report, without regard for the best interests of the minors, defeats the purposes behind dependency proceedings." (*Id.*, at p. 1210.)

The court reasoned that the Legislature did not intend section 366.2, the section at issue in *Charles B.*, to be mandatory in the jurisdictional sense as the section did not provide for a penalty or consequence for noncompliance, there was no suggestion that the Legislature intended to strip the court of jurisdiction in the event of a delay by the probation officer and section 352 authorized the court to continue any hearing beyond specified time limits as long as the continuance was not contrary to the interests of the minor. (189 Cal.App.3d at p. 1210.) Likewise, we conclude that the time limits of section 352, subdivision (b) are not mandatory in the jurisdictional sense.

B. *Since appellant did not object to any of the continuances, he has waived his right to claim any harm from the delay.*

■ Appellant argues that since the county dragged its feet in prosecuting the case, the court must dismiss the petition. The record indicates that the adjudication hearing set for August 16, 1989, was continued to October 18, 1989, and November 2, 1989. The record reflects no objection by appellant to the mother's motion to continue the November 2, 1989, hearing to November 17, 1989, nor to the court's continuance of the November 17, 1989, hearing to January 8, 1990.

Furthermore, at the conclusion of the adjudication hearing, appellant agreed to the February 8, 1990, date set by the court for the disposition hearing. The February 8, 1990, date was continued to April 3, 1990, because both parents wanted a contested hearing. Since appellant acquiesced in the multiple continuations, he cannot complain about any "foot dragging" as a ground to reverse the court's decision. (§ 352, subd. (c); cf. *In re Walter P.* (1991) 228 Cal.App.3d 113, 126-127 [278 Cal.Rptr. 602].)

II. *Substantial evidence[6] supports the court's rulings.*

A. *The sustained petition is supported by substantial evidence.*

■ " 'In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible. Where there is more than one inference which can reasonably be deduced from the facts, the appellate court is without power to substitute its deductions for those of the trier of fact . . . .' " (*In re Jason L., supra,* 222 Cal.App.3d 1206, 1214.)

■ Appellant contends that there was no evidence to support the sustained petition because there was no evidence as to how Christopher was injured nor any evidence that Richard was in danger. Appellant argues that Christopher's injuries could have been caused by a fall or by a family member who cared for him and that the evidence was that appellant had not acted violently with his sons. Appellant's argument is based on evidence in his favor and favorable inferences which could be drawn; he ignores the contrary evidence and the attendant inferences favorable to DCS which must be drawn on review.

The preadjudication social study, indicates that the Minors' maternal grandfather, aunt and uncle had reported that the parents had severely neglected the Minors by taking A.F.D.C. funds and using that money "to support their partying life style" and the day following the parents' receipt of the A.F.D.C. funds, it would be necessary for other family members to provide food, Pampers and clothing for the Minors. Such reports can constitute substantial evidence to sustain a dependency petition. (*In re Malinda S.* (1990) 51 Cal.3d 368, 379 [272 Cal.Rptr. 787, 795 P.2d 1244].)

In any case, the evidence consisted of more than the study. Dr. Beasley's testimony about the nature of Christopher's two independent head injuries as nonaccidental was prima facie evidence that he was a person described by section 300; a presumption which was not rebutted by appellant. (§ 355.1; *In re La Shonda B.* (1979) 95 Cal.App.3d 593, 600 [157 Cal.Rptr. 280].) Based on the testimony of the Minors' aunt and uncle about who cared for

[6]The county had to prove that the Minors were persons described by section 300 by a preponderance of the evidence and that removal from the parents' custody was necessary by clear and convincing evidence. (§§ 355, 361.)

Christopher at the time of his injuries, their observations of his deteriorating condition, and the reaction of his parents to their concerns, it was reasonable to infer that Christopher was injured by one of his parents and that appellant was responsible for the injury and/or neglect in not taking him to the hospital sooner for medical attention. It is also reasonable to infer that the same injury and/or lack of obtaining medical attention could have occurred to Richard.

The finding regarding the violent confrontations between the parents is supported by Mr. B.'s testimony about appellant's pulling the mother when she had Christopher in her arms and other arguments between the parents, particularly when appellant was intoxicated.

B. *Substantial evidence supports placing the Minors with their aunt and uncle.*

■ Appellant contends that the court improperly refused to place the Minors with him at the disposition hearing, which violated section 361, subdivision (a)'s prohibition against placing any limitations upon a parent's rights which are not necessary to protect a minor. Appellant argues that the court could have imposed a less restrictive limitation by releasing the Minors to him and imposing certain conditions such as the presence of another adult or attendance at family counseling.

As the noncustodial parent, placement with appellant is governed by section 361.2, not section 361. Pursuant to section 361.2, subdivision (a), if a noncustodial parent requests custody, the court "shall place the minor with the parent unless it finds that placement with that parent will be detrimental to the minor.

In this case, the court ruled that:

"The minors are hereby declared to be dependents of the court under . . . section 300, subdivisions (a), (b), (c) and (j). The court makes the following findings:

"The court finds by clear and convincing evidence that there is a substantial danger to the physical health of the minors and there are no reasonable means to protect without removal from the parents' custody. The finding is based on the following facts:

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Insofar as father is concerned, we have the facts of Count IV, which show violent confrontations with the mother which did pose a danger to the child's safety.

"Also the fact that father has not shown evidence that he is able to provide for the children. In fact, there is evidence that he has used County money for purposes other than what it was given for.

"Further, the court finds that reasonable efforts were made to prevent or eliminate the need for the [Minors'] removal from the home. The reasonable efforts consist of the following—let me just say this: when I say reasonable efforts, I'm referring to what I consider technical—technically legal reasonable efforts. I in no way am indicating that the County did all that it could do or all that it should do in this case. The County's efforts in this case fall something short of morally reasonable, but we are talking about technical reasonable efforts here. The County's efforts included referring the parents to parenting and drug classes and certainly we know that it's the court's opinion that both parents are in need of parenting classes and certainly mother is in dire need of drug classes as well.

"The parents were given money for that purpose and the record shows that the money was not used for the purpose that it was [given].

"Secondly, although I compliment the parents for beginning their parenting classes, which is something that works in their favor in the long run, the record does show that they were referred on February 14th, given money for that purpose and did not begin any semblance of a parenting class until March 19th, which is well over a month after that. And they have really only gone to five classes [of] what [appellant] characterizes may be the first month of a six-month course, which essentially is an indication that they have a long way to go as far as their parenting classes [are concerned]."

Appellant's prior neglect of his sons in not taking Christopher to the hospital sooner and using A.F.D.C. funds for himself constitute substantial evidence supporting the court's decision to deny him custody at this point in the proceedings. Boczan testified to a conversation with appellant in which appellant was irrational and incoherent. Furthermore, appellant was given money by DCS to enroll in a specific drug abuse program, but appellant used the money for food and transportation to look for work and attend counseling. Even though the court did not order drug counseling for appellant, attendance at such a program was a condition of receiving the money.

Appellant cites *In re Danielle M.* (1989) 215 Cal.App.3d 1267 [264 Cal.Rptr. 247] for the proposition that being unable to provide for his children is not a basis for refusing to place his sons with him. In *Danielle M.*, the court held that lack of employment and a separate residence were insufficient as a matter of law to support a finding that placement would be

detrimental and noted that there was not even a scintilla of evidence that the father was in any possible way a danger to his children, but had shown an incredible amount of patience and temperance under pressure during some difficult times. (*Id.*, at pp. 1270-1271.) On the other hand, in the case at bar, there is evidence that appellant neglected his children and was a danger to them. Appellant admitted to a social worker that his occasional use of alcohol would hinder his ability to provide adequate care and supervision of his sons.

Appellant argues that the court should not assume that he would not comply with court orders regarding the care of his sons just because he did not comply with the capricious request of DCS that he attend drug counseling. DCS's request was not capricious as it, and not appellant, has the right to determine how its allotted money shall be spent. Moreover, his refusal to honor that condition probably created a doubt in the court's mind about his willingness to obey any conditions which the court might impose on his having custody of his sons.

C. *Substantial evidence supports the finding that reasonable services were provided to appellant.*

■ Appellant contends that reasonable efforts were not made to prevent or eliminate the need to remove the Minors from their home as he was not provided with immediate or intensive services. Appellant suggests that Boczan was unfamiliar with the case and should have gone to his home and talked with his mother. Appellant seems to imply that Boczan should have evaluated appellant's home for the possible placement of the Minors with him. According to Boczan, he is not an investigator, but merely a provider of services such as transportation and referrals for counseling.

Section 361.2, subdivision (a)(2) provides that a court may order reasonable efforts be made for noncustodial parents. Since the statute is discretionary, appellant is not entitled to such services. (Cf. *In re Katrina C.* (1988) 201 Cal.App.3d 540, 550 [247 Cal.Rptr. 784].) Furthermore, the court found that reasonable services, in the way of counseling and parenting classes, had been provided, although those services had been barely minimal.

III. *County counsel's representation of the Minors does not warrant a reversal.*

■ In the instant case, county counsel represented both DCS and the Minors. Appellant contends that pursuant to section 317, subdivision (c),[7] the court erred in not appointing separate counsel for the Minors as the County took a position contrary to the section 319 presumption of family reunification. Appellant argues that stance created an actual conflict between DCS and the Minors, or in the alternative, if it did not create an actual conflict, then a potential conflict was created. Appellant urges that upon the filing of the dependency petition, the county should have declared a conflict, and the court should have appointed separate counsel for the Minors.

A. *An actual conflict of interest must exist before a juvenile court is required to appoint separate counsel for a minor.*

Juvenile court policies permit county counsel to represent a minor if there is no actual conflict of interest. (See Juvenile Departments of The Los Angeles County Superior Court's Revised Policies and Procedures Regarding Appointment of Counsel for Children in Dependency Proceedings (Feb. 4, 1991)[8].)

The court in *In re Patricia E.* (1985) 174 Cal.App.3d 1, 8, [219 Cal.Rptr. 783] interpreted former section 318's provision for the appointment of counsel for a minor if a conflict of interest existed as requiring a certificate that "joint representation will present no actual conflicts of interest."

That an actual conflict is required is also seen by legislative history of section 317. When the Legislature revised section 317, the initial language proposed was "provided that the counsel does not represent another party or county agency whose interests *may conflict* with the minor's." (Italics added.) (Sen. Bill No. 243, § 22, at p. 23 lines 33-35, as introduced Jan. 26, 1987.) As later amended, "may" was deleted, and the language became "provided that the counsel does not represent another party or county agency whose interests conflict with the minors." (Sen. Bill No. 243, § 21, at p. 23, lines 26-28 as amended in Assembly, July 9, 1987.)

---

[7]Section 317, subdivision (c) provides that:

"In any case in which it appears to the court that the minor would benefit from the appointment of counsel the court shall appoint counsel for the minor. Counsel for the minor may be a county counsel, district attorney, public defender, or other member of the bar, provided that the counsel does not represent another party or county agency whose interests conflict with the minor's. . . . If the court finds that there is a conflict of interest, separate counsel shall be appointed for the minor. . . ."

[8]Pursuant to letter dated August 2, 1991, we took judicial notice of this memorandum and of the legislative revisions to section 317 as reflected in Senate Bill No. 243.3.

Accordingly, we conclude that pursuant to section 317, an actual conflict of interest must exist before the court is required to appoint separate counsel for a minor jointly represented by county counsel.

B. *No actual conflict existed in this case.*

Appellant provides no authority for his proposition that a dependency petition which does not recommend family reunification automatically creates a conflict of interest on the basis that DCS's position is against the presumed position of a minor. Under appellant's reasoning, separate counsel would always have to be appointed whenever DCS did not recommend family reunification.

That section 319 impliedly favors family reunification can be seen in its provision for release of a minor from custody unless a prima facie showing has been made that the minor comes within section 300 and that certain listed circumstances (e.g., substantial danger to the physical health of the minor, substantial evidence that a parent is likely to flee the jurisdiction of the court) exist.

Given the purpose of juvenile proceedings to look out for the best interests of the minor, we do not read into section 319 a presumption that family reunification must always be recommended or an implication that the failure to recommend family reunification automatically creates a conflict between DCS and a minor's best interests. After all, the preference of the minor is not determinative of his or her best interests. (*In re Melissa S.* (1986) 179 Cal.App.3d 1046, 1058 [225 Cal.Rptr. 195].)

Appellant also suggests that an actual conflict of interest existed because the county failed to prosecute the case for almost a year. Since the court determined that detaining the Minors with their aunt and uncle was in their best interest, we are unconvinced that the failure to prosecute created an actual conflict of interest.

C. *If the court erred in failing to appoint separate counsel for the Minors, the error was harmless.*

In *In re Patricia E., supra,* 174 Cal.App.3d 1, the trial court had appointed county counsel to represent both the county welfare department and the minor in a proceeding to continue the minor as a dependent child of the court. Noting that former section 318,[9] mandates appointment of counsel

---

[9]In relevant part, at the time of the hearing in *Patricia E.,* former section 318 provided that: "Notwithstanding the provisions of Section 317, when a minor who is alleged to be a person

for a minor in every case, the appellate court acknowledged that dual representation by county counsel might be permitted if counsel certified that "the preliminary duties of section 318 had been completed and that counsel is of the opinion, wholly independent of the views and interests of his or her client the welfare department, that joint representation will present no actual conflicts of interest." (Fn. omitted.) (174 Cal.App.3d at pp. 7-8.)

■ Since the provisions for the appointment of counsel for a minor in a dependency proceeding are now contained in section 317, we conclude that before county counsel can be appointed to represent both DCS and a minor at a detention hearing, counsel should certify that joint representation will present no actual conflicts of interest and that the preliminary duties of section 317 have been completed.

In *In re Patricia E., supra,* 174 Cal.App.3d 1, 9, the court used the *People v. Mroczko* (1983) 35 Cal.3d 86, 105 [197 Cal.Rptr. 52, 672 P.2d 835], review standard of "an informed speculation" that joint representation may have led to prejudicial ineffective assistance of counsel. The *Patricia E.* court concluded that there had been an error because the record contained no indication that the minor's counsel had spoken to the minor, knew of her concerns or of her view of her situation; thus, the court held that counsel could not be said to have effectively represented the minor's interest. (*In re Patricia E., supra,* 174 Cal.App.3d 1, 9.)

Recently, in *In re Elizabeth M.* (1991) 232 Cal.App.3d 553 [283 Cal.Rptr. 483], the court disagreed with *Patricia E.*'s use of the *Mroczko* standard to evaluate the error in failing to appoint separate counsel for each child at a permanency planning hearing since the children had varying interests and instead used the *In re Richard E.* (1985) 21 Cal.3d 349, 355 [146 Cal.Rptr. 604, 579 P.2d 495] standard that reversal of the judgment was not required in the absence of a miscarriage of justice. In part, the court's reasoning was that the right to counsel in a dependency proceeding is a statutory rather than a constitutional right. (*In re Elizabeth M., supra,* 232 Cal.App.3d 553, 566-567.)

In *Richard E.,* the Supreme Court noted that the failure to appoint any counsel in the context of a freedom from parental custody and control proceeding was dissimilar to the denial of the fundamental right to counsel where one is charged with crime or juvenile misconduct. (*In re Richard E., supra,* 21 Cal.3d 349, 355.) The court further reasoned that none of

described in subdivision (d) of Section 300 appears before the juvenile court at a detention hearing, the court shall appoint counsel." Section 318 was repealed effective January 1, 1989, and the provisions for the appointment of counsel are now contained in section 317. (See Historical Note, 73 West's Ann. Welf. & Inst. Code, § 318 (1991 pocket supp.) p. 48.)

the personal deprivations flowing from the denial of counsel in juvenile court proceedings was present in the proceeding involved there. (*Ibid.*) Although the relevant appointment of counsel provision in *Richard E.* was a discretionary one (*id.*, at p. 353), we conclude that the standard of review for the failure to appoint separate counsel for a minor at a disposition hearing should be whether the record reflects a miscarriage of justice.

In *Richard E., supra,* the court reasoned that no miscarriage of justice resulted from the court's failure to appoint counsel for the minor as there was substantial evidence in the probation report that awarding custody to either parent would be detrimental to the minor, the father was afforded full opportunity to demonstrate that his continuing custody would be in the minor's best interests, and the father suggested nothing which independent counsel for the minor might have have done better to protect the minor's interests. (21 Cal.3d at pp. 355-356.)

Turning to the instant case, even though there was no certification of the lack of any actual conflicts of interest, there is no evidence that county counsel failed to adequately determine and argue in support of the "best interests" of the Minors. The Minors were very young children who could not express a preference for one type of placement over another. Both parents were repesented by counsel who asserted their respective positions and contested the disposition of the Minors. Appellant does not suggest any factual matters which independent counsel might have presented to the court. Accordingly, we conclude that there was no miscarriage of justice in the failure to either appoint separate counsel for the Minors or determine that no actual conflict existed.

### DISPOSITION

The April 3, 1990, order is affirmed.

Lillie, P. J., concurred. Johnson, J., concurred in the judgment.