Filed 9/27/13  Morgan M. v. Superior Court CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| MORGAN M. et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF SAN DIEGO COUNTY, <br><br> Respondent; <br><br><hr><br> SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al., <br><br> Real Parties in Interest. | D063873 <br><br> (San Diego County <br> Super. Ct. No. NJ14734) |

PROCEEDINGS in mandate after referral to a Welfare and Institutions Code section 366.26[1] hearing.  Blaine K. Bowman, Judge.  Petitions granted; stay vacated.

Law Offices of Johnson & Johnson and Carin L. Johnson for Petitioner Morgan M.

Kenneth R. Elliott for Petitioner Daniel M.

---

[1]   Unless otherwise specified, further statutory references are to the Welfare and Institutions Code.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Lisa M. Maldonado, Deputy County Counsel, for Real Party in Interest San Diego County Health and Human Services Agency.

Morgan M. and Daniel M. seek review of juvenile court orders denying family reunification services and setting a hearing under section 366.26. Morgan and Daniel contend the juvenile court abused its discretion and violated their due process rights to a fair trial when it denied Morgan's request for a continuance after the discovery of material new evidence that supported their position that their infant's multiple fractures were caused by vitamin D deficiency rickets. They further contend there is not substantial evidence to support the findings they severely physically abused their child and that reunification services were unlikely to prevent reabuse. Morgan also asserts she was denied effective assistance of counsel.

We conclude that the juvenile court abused its discretion when it denied Morgan's request for a continuance after the discovery of new evidence showing that their child had deficient levels of 25-hydroxy vitamin D at the time she sustained her injuries. Accordingly, we grant the petitions.

FACTUAL AND PROCEDURAL BACKGROUND

Morgan and Daniel are the parents of Ariel M., who was born in July 2012. On October 23, 2012, Morgan and Daniel noticed that Ariel's left leg was swollen and sought emergency medical care. Doctors diagnosed Ariel with fractures[2] to the ninth and tenth right posterior ribs, left proximal femur, left distal femur, right distal femur, right proximal fibula, right

---

[2] Doctors initially diagnosed Ariel with 14 fractures. Later X-rays confirmed only 11 fractures.

2

proximal tibia, right distal tibia, left proximal tibia, left distal tibia and the right acromion, which is the part of the scapula that forms the point of the shoulder.[3] Ariel's parents had no explanation for her injuries.

The evaluating radiologist reported that Ariel's bones generally had a normal mineralized appearance and the fractures were highly specific for nonaccidental trauma. Timothy A. Roberts, M.D., Ariel's attending physician, ordered vitamin D lab tests to determine whether Ariel had any underlying metabolic problems that could help explain her injuries. Dr. Roberts started Ariel on vitamins and iron for vitamin D supplementation.

At the hospital, Morgan and Daniel remained at Ariel's bedside and provided emotional care and support to her. Morgan was Ariel's primary caregiver. As a United States Marine, Daniel worked approximately 11 hours a day. When he returned home, he made dinner and helped Morgan. He did not have any concerns about Morgan's interactions with Ariel.

Ariel had had regular medical checkups since birth. When Ariel was one month old, the parents sought medical care when Ariel appeared to have bruises. They reported that the area around Ariel's right eye appeared bruised after she had been crying. She also had marks on her torso after having been held by several family members. At the time of the examination, Ariel had a grey ring-shaped bruise on each buttock surrounding the location of the ischium bone. Ariel's pediatrician noted "recurring episodes of increased venous pooling in the skin which gives the appearance of a bruise." The pediatrician gave Ariel a vitamin K shot and requested a dermatology consult, which occurred when Ariel was six weeks old. The dermatologist reported that the lesions did not appear to be ecchymosis (bruises) because they lacked the

---

3       Stedman's Medical Dictionary (28th ed. 2006) page 19, column 2 (Stedman's).

characteristic color progression due to degradation of hemoglobin. Ariel did not have any additional lesions after she received vitamin K.

On October 25, Sarah A. Villarroel, M.D., evaluated Ariel for possible genetic causes of fragile bones. Morgan had a history of bone pain in her hips and back. However, there was no family history of brittle bone disease (osteogenesis imperfecta). Ariel did not have risk factors for rickets. Although radiologic imaging demonstrated normal bone mineralization, in view of Ariel's multiple fractures, Dr. Villarroel considered an underlying vitamin deficiency and noted that vitamin D studies were pending. Dr. Villarroel did not believe there was a genetic cause of Ariel's injuries. The discriminant factor would likely be Ariel's placement in a protective location. If she did not continue to fracture, her injuries would be highly suggestive of nonaccidental trauma.

After Ariel's discharge from the hospital, Dr. Roberts discovered that a 25-hydroxy vitamin D level[4] had not been ordered and asked the lab to obtain 25-hydroxy vitamin D levels from Ariel's serum. The lab result for this test was not included in the medical records that were provided to the San Diego County Health and Human Services Agency (Agency).

On October 29, 2012, the Agency filed a two-count petition alleging the parent(s) physically abused Ariel and she suffered severe physical abuse by a parent, or by any person known by the parent, and the parent knew or reasonably should have known that the person was physically abusing the child.[5] (§ 300, subds. (a) & (e).) The Agency detained Ariel in

---

[4]     The 25-hydroxy vitamin D test measures body's ability to store vitamin D.

[5]     The United States Navy conducted a criminal investigation and issued an interim report in December 2012. The record does not reflect the outcome of the investigation.

protective custody, first with a foster parent and then with her maternal grandmother. The Agency recommended that the juvenile court deny reunification services to the parents.

The jurisdiction and dispositional hearings were continued to allow the parents to obtain a second opinion about Ariel's injuries at the Osteogenesis Imperfecta Clinic at Shriner's Hospital for Children (Clinic). Gayle H. Tyerman, M.D., examined Ariel at the Clinic on December 3. Referring to X-rays taken that day, Dr. Tyerman said Ariel's bones appeared to be healthy and showed normal mineralization, and she did not have any new fractures. Other than the unexplained fractures, Ariel was a completely healthy baby. Ariel's genetic test was negative for osteogenesis imperfecta.

In early March 2013, social worker Jennifer AhSing filed a report with the court. She stated the family was respectful and cooperative, and the parents were appropriate and loving with Ariel during supervised visitation. They were participating in voluntary services. The parents' history and current circumstances did not indicate there were any other risk factors in their home. However, the Agency's medical experts had determined that Ariel's injuries were nonaccidental. The parents were Ariel's only caregivers during the period of time in which the injuries occurred. Due to the severity of the injuries and the fact no perpetrator had been identified, the Agency recommended that reunification services not be provided to the parents.

The parents contacted Charles J. Hyman, M.D., a board certified pediatrician and an expert in child abuse. After reviewing Ariel's medical records and interviewing the parents, Dr. Hyman issued a summary report on April 16. He concluded that Ariel did not have normal bone mineralization and met the clinical diagnosis of bone fragility disorder. Dr. Hyman said hospital physicians did not consider the mother's history of musculoskeletal pain and facet

5

sclerosis of the spine, and maternal family members' history of bone-related problems. Morgan had used meloxicam, a nonsteroidal anti-inflammatory drug, until the sixth month of her pregnancy with Ariel, and had a high body mass index during most of her pregnancy. Those factors could have caused a decrease in bio-available vitamin D. When Ariel was seen by hospital physicians in October 2012, they did not perform the correct test to assess vitamin D deficiency, the 25-hydroxy vitamin D test. The parents did not have any unusual psychosocial risk factors for child abuse in their history. Dr. Hyman said he needed additional time to produce a more comprehensive report citing medical and scientific literature supporting his findings.

On April 26, Daniel, joined by Morgan, asked the court to continue the jurisdictional hearing. The court denied the motion. The Agency offered its reports in evidence and presented the testimony of Kathleen M. Dully, M.D., a pediatrician and board certified child abuse specialist with Rady Children's Hospital and the Naval Medical Center, after which it rested its case. Minor's counsel did not present any affirmative evidence.

Dr. Dully testified the medical records showed that Ariel's injuries occurred as a result of nonaccidental trauma. There were no alternative explanations for her injuries, which occurred as a result of shoulder trauma, chest-squeezing trauma and leg-yanking trauma. Dr. Dully would have liked to have had a 25-hydroxy vitamin D level drawn at the time of the injuries because it reflected the subject's ability to store vitamin D. However, Ariel's two other vitamin D levels were normal and Dr. Dully expected the 25-hydroxy vitamin D level would also have been normal. The 25-hydroxy level was an indicator for rickets or vitamin D deficiency. In advanced cases, a vitamin D deficiency would increase susceptibility to

6

fractures. If Ariel's 25-hydroxy vitamin D level was abnormal, Dr. Dully would need time to research the possible cause of any deficiency. However, Ariel's X-rays did not show any rickets or vitamin D deficiencies and her injuries had healed normally. If a child had a vitamin D deficiency, treatment with supplement vitamin D would restore normal vitamin D levels in two weeks to several months.

Morgan was represented by attorney Philip Walden. On the weekend of April 27, Morgan contacted another attorney, Carin Johnson. On April 29, Johnson filed motions to substitute in as counsel of record and to continue the trial. She requested a three- to four-week continuance to complete discovery, consult with appropriate experts and ensure the mother's due process rights. She informed the court that a set of X-rays taken in November 2012 were missing from Ariel's medical records. The court denied the motion for a continuance, stating attorney Walden was prepared to go forward with the trial and Morgan had had five months to request the November X-rays. The court said, "Here we are in the middle of a trial, and it wasn't as if we had some new evidence that was presented during the trial that suddenly made everybody realize that there's these missing X-rays." The court permitted Johnson to represent Morgan as associate counsel. Johnson called Dr. Hyman to testify.

Dr. Hyman testified that Ariel had rickets.[6] Her X-rays showed diminished mineralization and other bone abnormalities, which he described in detail. Ariel's shoulder injury was very rare in children with normal bones. Her bones showed a start and stop pattern

---

[6]    Rickets is a disease attributable to vitamin D deficiency, and characterized by overproduction and deficient calcification of osteoid tissue, with associated skeletal deformities; disturbances in growth, hypocalcemia; usually accompanied by irritability, listlessness, and generalized muscular weakness; fractures are frequent. (Stedman's, *supra*, at p. 1697, col. 1.) "Osteoid" means "[r]elating to or resembling bone" or "[n]ewly formed bone matrix before calcification. (*Id.* at p. 1390, col. 1.)

of mineralization, indicating problems with mineralization in utero. The alleged rib fracture was healing in a manner that was indicative of abnormal bone or bone that had repetitive stress injuries. In a child with bone fragility, picking up the child under its arms could cause rib fractures. Ariel's X-rays of March 18, 2013, showed that her bone mineralization was now within normal limits.

On April 30, Morgan asked the court to relieve Walden as her attorney and allow Johnson to represent her. Johnson informed the court she had located Ariel's 25-hydroxy vitamin D test results, which showed that Ariel had a deficient vitamin D level, and two sets of X-rays, from November 5 and 26, that were not included in the medical record. Johnson asked for a three- to four-week continuance. The court denied the motion.[7]

The hearing resumed with further testimony from Drs. Hyman and Dully, and concluded on May 3 with testimony from Dr. Hyman and social workers Mindy Neri and Jennifer AhSing.

Dr. Hyman said Ariel was not abused. He did not have time to review all the records, but those he did review unequivocally showed that Ariel had abnormal bones. There were no medical findings alone or in combination that were distinctively characteristic of child abuse. The parents' psychosocial history did not support a finding of child abuse. Ariel was otherwise healthy and untraumatized. Ariel's bones had abnormal mineralization patterns and could fracture with normal, appropriate handling. For example, her left proximal femur, ephemeral neck and metaphysis showed growth plate mineralization problems, which by definition was rickets. The left distal femur did not heal like a typical fracture. The fracture line just

---

[7] We discuss the April 30 motion for continuance in greater detail in Discussion, part B, *post*.

disappeared which was a pattern of healing rickets. One of Ariel's rib fractures was no longer evident on the November X-rays. This evinced changes in mineralization, not a healing fracture. Except for the left hip area, there were no signs of significant trauma during the period in which the fractures occurred or at the location of the fractures, which also supported a diagnosis of bone fragility. In Dr. Hyman's opinion, a differential diagnosis[8] of bone fragility fit the history, physical, lab findings and other data in the case.

Dr. Dully acknowledged the 25-hydroxy vitamin D test showed that Ariel had vitamin D deficiency at the time that her injuries were discovered. The results did not change Dr. Dully's diagnosis of nonaccidental injury. There was no other information consistent with a diagnosis of vitamin D deficiency rickets. Fractures were generally not seen in cases of rickets unless there were biochemical abnormalities and radiological findings. In March 2013, Ariel's bones were normal. Her 25-hydroxy vitamin D level was 44. The medical records did not indicate she received any special treatment for vitamin D deficiency. Dr. Dully could not say with absolute certainty that Ariel did not have rickets, but she did not see enough evidence to make a positive diagnosis. When questioned about Dr. Hyman's description of bone abnormalities, which involved a comparison of Ariel's initial X-rays and those taken in March, Dr. Dully said she would need appropriate X-ray equipment to evaluate the findings, and could not comment based on slides projected on a courtroom wall. She acknowledged that radiologists could not exclude a diagnosis of bone fragility. However, it was more likely than not that Ariel's injuries were nonaccidental.

---

[8] A differential diagnoses is "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." (Stedman's, *supra*, at p. 531, col. 1.)

9

The juvenile court said the case presented an issue of causation. There was no question that if Ariel was physically abused, she was abused by her parents. The court gave more weight to Dr. Dully's testimony than it did to Dr. Hyman's testimony. Unlike Dr. Hyman, Dr. Dully was board certified in child abuse pediatrics. Her testimony was corroborated by Dr. Villarroel's reports. Dr. Hyman believed the parents were telling the truth and therefore his opinion was subjective. In addition, Ariel had not suffered any injuries since she was removed from her parents' care. The court sustained both counts of the section 300 petition by clear and convincing evidence.

At the disposition hearing, social worker AhSing said the parents interacted positively with Ariel, who enjoyed their company. Morgan appeared to be very bonded with the baby. Nevertheless, AhSing recommended the court deny reunification services to the parents. In view of the severity of Ariel's injuries, providing services to the parents would not prevent reabuse.

The court removed Ariel from the custody of her parents and placed her in relative care. The court denied reunification services to the parents under section 361.5, subdivision (b)(5), and set a section 366.26 hearing.

Morgan and Daniel petitioned for review of the court's order under California Rules of Court, rule 8.452. They request that this court reverse the order setting a section 366.26 hearing. This court issued an order to show cause, the Agency responded and the parties waived oral argument. On August 16, 2013, this court granted the petitioners requests to stay the section 366.26 hearing.

DISCUSSION

A

*Contentions on Appeal*

Morgan contends the juvenile court abused its discretion and denied due process to her when it refused to grant her request for a continuance after the discovery of material new evidence. She claims she received ineffective assistance of counsel when her first attorney did not properly investigate the case and took a position during the trial that was adverse to her interests. Morgan maintains she was denied a fair trial by the trial judge when he required new counsel to proceed at trial without adequate preparation. She argues there is not substantial evidence to support the juvenile court's findings that she and her husband were responsible for inflicting physical and severe physical abuse on their infant daughter and that they were not entitled to reunification services.

Daniel[9] contends there is not substantial evidence to support the finding that he abused his daughter or knew she was being abused and the court erred when it denied reunification services to him.

B

*Additional Factual and Procedural Background*

On Tuesday, April 30, Morgan asked the court to relieve attorney Walden and allow attorney Johnson to represent her. Johnson asked for a three- to four-week continuance to allow medical experts to review the newly discovered 25-hydroxy vitamin D test results and X-

_____

[9]     With the exception of the claim of ineffective assistance of counsel, Daniel joins in Morgan's arguments.

rays, and give her time to properly prepare for trial.  The juvenile court denied the continuance, stating:

> " . . . I will grant the motion to relieve Mr. Walden if you [referring to Johnson] are ready to proceed today.  If you're not, then you're done.  You can leave.  If you want to proceed today, then you can, but I'm not going to relieve Mr. Walden in what appears to be a deliberate tactic to delay these proceedings . . . .  [¶] . . . [¶] We've been at this since Friday. . . .  I'm in the middle of an extensive, complicated jury trial.  I sent the jury home early yesterday.  I sent the jury home early today.  And we are dealing with a . . . minor[] who entered the system when she was two months old.  And this case was pushed all the way back to the six-month date.  We are now one day beyond that.  And there has been ample opportunity to investigate the case.  I understand that you were not the attorney on the case up until a few days ago.  So it's your call.  Do you want to represent her now?  If so, I will grant the request to relieve Mr. Walden.  If not, Mr. Walden remains counsel of record, and we're going to get going. . . ."

Johnson said there was absolutely no intent to delay the proceedings.  They received new evidence that morning that should have been discovered months earlier.  She was working as fast as she could and discovered two sets of X-rays and a vitamin D test that were not included in the record.  Johnson asked for three to four weeks to prepare her case and allow the experts to review the new evidence.

The court said if Johnson was ready to proceed with the trial and Morgan would waive any claim on appeal of ineffective assistance of (new) counsel, the court would allow Johnson to substitute in as Morgan's attorney.  Johnson said she would proceed with trial; however, preparation in the case was not completed due to ineffective assistance of counsel.  Morgan waived her right to claim ineffective assistance of (new) counsel, the court relieved Walden and the trial proceeded.

12

C

*Statement of Law and Standard of Review*

The juvenile court has the power to "control all proceedings during the hearings with a view to the expeditious and effective ascertainment of the jurisdictional facts and the ascertainment of all information relative to the present condition and future welfare of the person upon whose behalf the petition is brought." (§ 350, subd. (a)(1); *Renee S. v. Superior Court* (1999) 76 Cal.App.4th 187, 193.) In some cases, there may be "tension between the timely resolution of dependency cases and the thoughtful exercise of judicial discretion." (*In re Sean E.* (1992) 3 Cal.App.4th 1594, 1599.) In cases that necessitate additional time, there is no legal impediment for slight and justified delays provided the court complies with the statutory requirements authorizing continuances under section 352. (*In re Sean E.,* at p. 1599.)

Section 352 states that at a party's request, the juvenile court may continue any dependency hearing beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interests of the child. In considering the child's interests, the court is required to give substantial weight to a child's need for prompt resolution of his or her custody status, the need to provide children with stable environments and the damage to a child from prolonged temporary placements. Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary for the continuance. (§ 352, subd. (a).)

Notwithstanding any other provision of law, if a child has been removed from the parents' custody, no continuance shall be granted that would result in the dispositional hearing being completed more than 60 days after the hearing at which the child was removed or

detained, unless the court finds there are exceptional circumstances requiring such a continuance. In no event shall the court grant continuances that would cause the dispositional hearing to be completed more than six months after the detention hearing.[10] (§ 352, subd. (b).)

A reviewing court will reverse an order denying a continuance only upon a showing of an abuse of discretion. (*In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1187.) The abuse of discretion standard gives the court substantial latitude. However, the scope of the court's discretion is determined by the legal principles governing the subject of the action. A judicial determination that falls outside the applicable principles of law constitutes an abuse of discretion. (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 119.)

D

*The Juvenile Court Abused Its Discretion When It Denied Morgan's Motion for a Continuance After the Discovery of Material New Evidence*

The juvenile court is required to control dependency hearings with "a view to the expeditious and effective ascertainment of the jurisdictional facts and the ascertainment of all information" concerning the child's present condition and future welfare. (§ 350, subd. (a)(1).) Here, the juvenile court emphasized expeditiousness over its obligation to ascertain all

---

10     The six-month time limit of section 352, subdivision (b) is not mandatory in the jurisdictional sense; there is no requirement that the petition be dismissed if the time limits are not met. (*In re Richard H*. (1991) 234 Cal.App.3d 1351, 1362; *In re A.R.* (2009) 170 Cal.App.4th 733, 744.)

information concerning the child's condition and welfare.[11]  The uncontroverted evidence shows that Ariel's deficient 25-hydroxy vitamin D level was a significant factor in determining the possible cause or causes of her injuries.  In addition, the discovery of additional X-rays, and the ability to track the healing process through those X-rays, was also highly relevant to a differential diagnosis of bone fragility or nonaccidental injury.  The evidence in this case is completely forensic.  No risk factors were identified that would tend to corroborate a claim of child abuse or neglect.  In view of the discovery of significant material evidence, notwithstanding the fact that the hearing was already past the six-month time limit for the completion of the dispositional hearing, the court should have continued the hearing to allow a thorough review of all the medical information in Ariel's case and give counsel adequate time to prepare a defense on that evidence.  (Cf. *In re Jessie L.* (1982) 131 Cal.App.3d 202, 210 [Where there has been a failure of discovery the normal remedy is a continuance to enable the defense to meet the new evidence.].)

The juvenile court did not place appropriate weight on the fact that neither of the medical experts or Ariel's treating physicians reviewed the same set of data in reaching their conclusions and that significant information was missing from the record under review.  Dr. Villarroel, the pediatric genetic expert who examined Ariel, was concerned about a vitamin deficiency as an underlying cause of Ariel's injuries but did not yet have the results of vitamin D studies.  There is nothing in the record to show that Dr. Villarroel was aware of Ariel's deficient 25-hydroxy vitamin D level when she concluded that Ariel's injuries were likely

---

[11]     A brief continuance would have served the interests of judicial efficiency by allowing the court to complete its criminal trial without having to hear two complicated cases at the same time or inconveniencing the jury panel.

caused by nonaccidental trauma. The record shows that Dr. Dully reviewed the November 5 X-rays, but was not aware of the X-rays that were taken on November 26 and March 2013. In addition, Drs. Dully and Hyman said they needed more time to review the medical records. Dr. Dully testified that she did not expect Ariel's 25-hydroxy vitamin D level to be low but, if it was, she would need additional time to research the possible cause of any deficiency. When asked about Dr. Hyman's description of bone abnormalities, which involved a comparison of Ariel's initial X-rays and those taken in March, Dr. Dully said she would need appropriate X-ray equipment to evaluate the findings, and could not comment based on slides projected on a courtroom wall. Dr. Hyman had only a few minutes to read the radiologists' reports and look at the X-rays from November 5 and 26. He said it was not enough time to review everything. Without a continuance, the medical experts did not have sufficient time to assess Ariel's differential diagnosis in view of the newly discovered evidence.

We appreciate the concerns of the trial court and its attention to the statutory requirements making it incumbent on our courts to proceed expeditiously in matters of child custody, particularly when the physical welfare of a child is involved. However, the record shows that a continuance was not contrary to Ariel's interests. Ariel was living with her grandmother and doing well. A three- to four-week delay in the jurisdictional hearing would not materially affect her interests in permanency or the prompt determination of her custody status. (§ 352, subd. (a).) The Agency was recommending denial of reunification services on a finding of severe physical abuse, which would place the case on a fast track to a section 366.26 hearing with the attendant probability of loss of parental rights. (§ 366.26.) The risk of possible injury to Ariel's interests from a brief continuance of the proceedings to allow all

16

experts to review all available medical records and findings was relatively slight, whereas an incomplete analysis of newly discovered material evidence may have lifelong consequences for the child and her parents. In view of the exceptional circumstances of this case, reversal is necessary to avoid a miscarriage of justice.[12] (Cal. Const., art. VI, § 13.)

## DISPOSITION

The petitions are granted. The jurisdictional and dispositional findings and orders are vacated. The matter is remanded to the juvenile court with directions to grant a continuance of the jurisdictional hearing and allow further presentation of evidence. The juvenile court may, in its discretion, appoint an independent qualified medical expert to review the child's comprehensive medical records. The stay issued August 16, 2013, is vacated.

BENKE, Acting P. J.

I CONCUR:

HALLER, J.

I CONCUR IN THE RESULT:

HUFFMAN, J.

---

[12] Because we conclude that the juvenile court abused its discretion when it denied Morgan's request for a continuance after the discovery of material new evidence, we need not address Morgan's argument concerning ineffective assistance of counsel and the parents' arguments concerning due process violations and the sufficiency of evidence to support the jurisdictional and dispositional findings and orders.